UNITED STATES of America, Plaintiff-Appellee,

v.

Carolyn BONDS, Defendant-Appellant.

No. 74–3745.

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1976.

Rehearing and Rehearing En Banc Denied April 14, 1976.

Ellen Goldman, Marks, Miss. (Court-appointed), for defendant-appellant.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before BROWN, Chief Judge, RIVES and GEE, Circuit Judges.

RIVES, Circuit Judge:

The defendant[1] appeals from a judgment of conviction on all counts of a nine count indictment. Each count charged the defendant with causing the interstate transportation of a falsely made and forged security, in violation of sections 2 and 2314, Title 18, United States Code. Each count described a different forged check as the security transported. The court sentenced the defendant to imprisonment for three years on each count, the sentences to run concurrently.

On appeal the defendant presents for review the overruling of her pre-trial motions to suppress; certain rulings on the admissibility of evidence; the denial of defendant's motion for severance of Counts One, Two, and Three from the remaining six counts of the indictment; and the denial of the defendant's motion for a directed verdict of acquittal on Counts One, Two, and Three.

We find no reversible error and affirm the judgment of conviction.

The evidence established beyond any doubt that all nine checks were forged and were transported in interstate commerce in violation of sections 2 and 2314, Title 28, United States Code. The questions in dispute concerned the identity of the defendant as a guilty person under each count of the indictment. Six of the forged checks were drawn on the account of Dodds & Elwell Associates with the Manchester Bank, Manchester, New Hampshire—the checks described in Counts 1, 3 and 4, 7, 8, and 9. Estelle Johnson was the fictitious name selected as payee for three of those checks, those described in Counts 1, 3 and 4. The fictitious payee of the check described in Count 7 was Paulette Beard. The forged checks described in Counts 8 and 9 were made payable to Patricia Benson.

The check described in Count 2 was on the account of Robert King, Jr., with the Union Planters National Bank, Memphis, Tennessee, and was also made payable to Estelle Johnson.

## I. The Motions to Suppress

On appeal, the defendant insists that she was arrested illegally. For such relevance, if any, as the legality of defendant's arrest may have, we note that when represented at trial by counsel other than her appellate counsel she filed two motions to suppress, in neither of which did she make any claim of illegal arrest. After an extensive pre-trial hearing the district judge denied the motions in an order which reads in pertinent part:

"ORDERED that the Motion To Suppress All Oral Statements Made By Defendant Including Background

---

1. The parties will be referred to as the defendant and the Government.

And Personal History be and hereby is denied inasmuch as such statements were knowingly, understandingly, freely and voluntarily made;

"ORDERED that Motions To Suppress 1. Any identification made as a result of a lineup, 2. Any and all eyewitness identification which arises as a result of photographic identification, and 3. All checks, documents, be and hereby is denied inasmuch as the lineup and photographic displays were not unnecessarily or impermissibly suggestive or conducive to, any substantial likelihood of irreparable misidentification, and the admissibility of the checks and documents must be determined at trial."

On the third day of the trial the defendant did object to the introduction of a set of fingerprints on the ground that they were taken when she was under an illegal arrest. Her counsel admitted however that he had no witness to prove an illegal arrest. (III.R. 504.)[2]

While she was in the jail prior to indictment, two F.B.I. agents interviewed her. She read the written form stating her constitutional rights, stated that she understood it and signed the form. She made no confession but, according to Agent White, she "denied any knowledge about the cashing of any fraudulent checks. And she gave us some descriptive data concerning herself, and the interview was completed." IV.R. 53. None of the descriptive data and no statement made by the defendant was introduced at the trial.

The defendant testified that she was left under the suspicion that she had no alternative but to give the agents information about her personal background. IV.R. 31, 32. Upon her first interview by the two agents, the defendant had given her name as Carolyn Dailey instead of Carolyn Bonds. Agent White testified that on this first interview she was very cooperative and offered no objection to giving any background information.

He admitted some doubt as to the second interview, testifying as follows:

"Q Well, at any time during the course of any of these interviews did you ever say to her or imply to her in any way, or suggest to her, that you had a right to get accurate descriptive data from her about her background as distinguished from the facts of the case?

A I think the second interview I may have told her that we had the right to know who she was.

BY THE COURT:

Q How about on the first interview?

A No, sir. Because the first time I assumed the descriptive data and all the information was accurate."

\* \* \* \* \* \*

"Q Now, you did you mention that you were entitled, the second time, that you had a right to know who she was?

A I am not sure exactly what the words were, but I may have conveyed that impression to her. It is possible I conveyed that impression to her that we may have had the right to know who she was."

\* \* \* \* \* \*

"Q Did anything that you or the other agent said or did, or anything that was said or done on you all's behalf, or the local authorities, tend to create a belief in this young lady's mind that she had no alternative but to answer questions to you?

A No, sir. I think we made it quite clear that she didn't."

\* \* \* \* \* \*

"Q And she did never tell you all, 'I don't want to talk to you all about it. I don't want to discuss this. I don't want to talk about that'?

---

**2.** It was eventually proved that the fingerprints introduced were taken at her arraignment on the indictment. (III.R. 512, 541.)

A No, sir.

Q She never did show any reluctance to discuss anything with you?

A No, sir."

Notwithstanding the candor of Agent White's testimony we think that the district court understood its meaning. Of course, the choice of credibility as between the testimony of the defendant and that of the F.B.I. agent was for the jury. We hold that no reversible error was committed in denying the motions to suppress. We agree with the oral findings of the district judge:

"It is almost conclusively shown here that this defendant, who admits that she has had at least an eleventh grade education, who has worked for several months as a waitress in two different locations, who can read and write and can understand what she reads, that she read this Waiver of Rights form. She stated to the agent that she understood it, and she consented to and did submit herself to an examination without any objection, in fact, upon waiver of her right on the first examination.

"The second examination, while it is possibly true that the agent said to the defendant at the time that we need to identify you, to find out exactly who you are, it was only two days after her rights had been explained to her, and she, herself, said that the information she gave to the officer, or to the F.B.I. Agent on the second examination, on December the 22nd, was voluntarily given.

"The Court finds that she understood fully her rights with reference to these matters—her right to counsel and her right to remain silent, and her right to have an attorney present, and all the rights set out in the Rights form, that she understood what they were and she voluntarily waived them and gave this information to the agents."

II. Admitting Government Exhibits

Government Exhibit 19 was a photograph of a line-up admitted into evidence over the defendant's objection that it had been improperly authenticated. The authenticating testimony reads:

"Q Mrs. Bennett, would you look at that photograph, Exhibit 19 for identification, and tell us whether or not you recognize the scene that is shown there?

A Yes, sir, I believe I do.

Q And what is that?

A I don't really remember all the people that were involved that day, but it looks similar to the line-up that we witnessed in Hernando."

In objecting, defendant's attorney stated, "The witness has not stated that this is in fact the line-up. She has equivocated in regard to her answer." On appeal it is argued that "For all that Mrs. Bennett appeared to remember, it could have been a photograph of some other lineup in which the defendant participated." We think it clear that the witness was not equivocating, and was merely stating her recollection that the photograph represented the line-up which she and five others had separately witnessed in Hernando. Defendant's objection to its admissibility was properly overruled.

Government Exhibits 20, 21, and 22 were bank records admitted as business records under 28 U.S.C. § 1732. A teller who had access to the records and participated in some of the transactions testified that the records were kept in the regular course of business. On examination by the court she testified as follows:

"Q Well, let me ask you. During all this period of time here with reference to this matter you were the employee of this association; is that correct?

A That is.

Q And these records, were they kept under your supervision or did you assist in the keeping of them or handling the records there in the office?

A Well, we had a general file that, you, know, anybody had access to."

\* \* \* \* \* \*

"Q And at that time, the time the subpoena was served upon you, were you in control of these records that you have here today?

A Well, I had access to them. I wasn't the only one there."

Considering the wide discretion of the trial court and the minimal authentication proof required as explained in *United States v. Blake* (1973), 5 Cir., 488 F.2d 101, 105, we hold that the records were properly admitted.

Government Exhibit 50 is a small paper-bound book titled "SAVINGS ACCOUNT" and described as a "record of deposits and withdrawals." It is a book given by the bank to its customers to furnish the customer a record of deposits and withdrawals. Mrs. Allison, a receptionist for the Bank of Mississippi, had on November 30, 1973, recorded a $25.00 deposit together with the account number and the customer's address, in this case, "4572 Faronia, Southaven, Miss. 38671." The only other entries were of a withdrawal of $10.00 and a resulting balance of $15.00, which were made by Mrs. Peggy Hughes, Teller, and dated "12/5/73 p. h." Mrs. Allison was not present when Mrs. Hughes handled that transaction but testified that the customer had then left the little book on the window and it was mailed back to her at the address shown. The trial court sustained defendant's objection to that part of the witness' testimony to the effect that the book was left on the window and was mailed back to the customer at the address shown. Mrs. Allison further testified that she handled the return mail for the bank, and received this book in the return mail. The book was in an envelope addressed to 4572 Faronia and the envelope had a post office stamp indicating "return to sender, no such street number." She further testified

"Q And after you received it in the return mail what then did you do with it?

A Well, we just held it in a drawer back there that we put hold mail in,

hoping they will come in and call for it. Sometimes they do and sometimes they don't."

There ensued the following:
"THE COURT:

I think the document is admissible into evidence on two theories. One theory is that this witness here personally made and can personally identify this document as having been a document which she personally made, so I think it is competent in evidence on that ground."

Mrs. Peggy Hughes later identified Government Exhibit 50 in the following testimony:

"Q Would you look at Exhibit 50 and tell us whether or not you have seen that before, Mrs. Hughes?

A Yes, I have.

Q And under what circumstances have you seen that before?

A She withdrew $10.00 out of her savings account?

Q Did you handle that transaction?

A Yes, sir.

Q Would you tell us how that transaction was made?

A She just came to my window and said she wanted $10.00 out of her savings account, so I filled out a withdrawal slip, and put my initials on it when I had checked her balance to make sure she had $10.00. And I gave her the $10.00 and signed it in the book. But she left the book with me. I forgot to give it back to her.

Q I see. Was Exhibit 50, now, the book that you are referring to?

A Yes, sir.

Q What entries did you make in the book?

A I wrote the date, how much she withdrew, my initials, and how much her balance was after she got the $10.00.

Q And then after she left the book with you, what did you do with the book?

A They took it from me.

Q   Who was that?

A   One of the girls.

Q   Who was that?

A   I don't remember which one of them took it from me, but it was right after her name started coming up a lot at the bank, you know, and they started talking about her, and they came and took it away from me.  I was holding it.  I was going to give it back to her if she came in again, you know.  And then they came and got it from me.

Q   And you don't recall who it was?

A   No, sir, I don't."

■   On appeal the defendant urges that since the book was to be kept in the customer's custody it was not a business record of the bank within the purview of 28 U.S.C. § 1732(a).  It relates however to the bank's business with the customer and was at the times of entries, and also after it came back by return mail, in the bank's custody.  We would agree with the district court that it was admissible under the statute insofar as that statute was relevant to the purpose for which the exhibit was offered.  See *Palmer v. Hoffman,* 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645.  The exhibit was offered partly to show the dates on which the two witnesses, Mrs. Allison and Mrs. Hughes, had an opportunity to identify the bank's customer.  For that purpose the books and records of the bank could be considered as reliable and trustworthy under the statute.

■   Another and perhaps more important purpose of the government in this case was to show that a latent fingerprint had been found upon the book.  That purpose had nothing to do with the business entries in the book or even with the book as a book as distinguished from any other object on which a latent fingerprint might be found.  Someone turned the document over to a Mr. Strickland, a Branch Manager and a Vice President of the bank.  He made no notation and had no independent recol-

lection of who handed it to him.  III.R. 460.  Mr. Strickland in turn "gave it to the agents."  *Id.*  The agent or agents were not identified.  By letter dated January 7, 1974, (III.R. 571) the F.B.I. sent the document to its "Latent Fingerprint Section" in Washington where after proper technical procedures a latent fingerprint found on the document proved to be identical with a fingerprint of the defendant.

There are thus times between December 5, 1973,[3] and January 7, 1974,[4] when the person responsible for the custody of the document cannot be identified.  However, reasonable jurors could have believed that the circumstances were not suspicious.  There is no reason to suspect that the document left the custody of some one or more of the bank's employees or agents of the F.B.I. who had no apparent motive to transfer this latent fingerprint from some other document or source.  It is hardly possible that the defendant was "framed" insofar as concerns this latent fingerprint but, under all of the circumstances it is not so probable that this evidence should be excluded from the jury's consideration.  The question goes, we think, to the probative value of the fingerprint evidence.  See *United States v. Corso,* 4th Cir., 1971, 439 F.2d 956, 957.  The weight to be given the evidence is for the determination of the jury in the light of the surrounding facts and circumstances.  If the fingerprint evidence stood alone in support of a judgment of conviction the rule would be much more strict.  As said in 30 Am.Jur.2d § 1144 at 320:

"To warrant a conviction, however, it has been held that the fingerprints corresponding to those of the accused must have been found in the place where the crime was committed, under such circumstances that they could only have been impressed at the time the crime was committed." (Footnote omitted.)

■   There was ample supporting evidence to identify the defendant as the

---

**3.**  When the document was left with Mrs. Peggy Hughes by "Patricia D. Benson."

**4.**  When the F.B.I. mailed the document to Washington.

Patricia D. Benson who caused some of the forged checks to be transported in interstate commerce. There was also evidence tending to show that the defendant was the Estelle Johnson who caused the checks described in six of the other counts to be transported in interstate commerce. The exhibit was certainly admissible in connection with those counts to support the charge of fraudulent intent; and the transactions are so interlocked that we think it was admissible for all purposes.

### III. Counts 1, 2, and 3.

█ The district court acted well within its discretion in denying the defendant's motion for severance of Counts One, Two, and Three from the remaining six counts of the indictment.

As to the denial of defendant's motion for a directed verdict or judgment of acquittal on those three counts, it is true that the only witness who undertook to identify the defendant as being the Estelle Johnson involved in those three counts was Mrs. Rita C. Bennett. The bank records show that on July 10, 1973, a new checking account was opened in the name of Estelle Johnson with an initial $40.00 cash deposit. Mrs. Bennett described her duties as a secretary-receptionist who sometimes opened new accounts. On the occasion in question Miss King, the teller who normally opens new accounts, was temporarily away from her desk and the customer waited with Mrs. Bennett until Miss King returned. Mrs. Bennett testified:

"Q Can you describe the person that opened the account?

A She was a black, and she was tall, and she was dressed real good. She was an attractive black lady, and I would say she was—I am not very good at guessing age—but probably in her late 20's or early 30's.

Q All right.

A And she was dressed real good though, I did notice that. She had on a cape. I think it was a skirt, it could have been a jacket. Like I said, the cape was tied (demonstrating) and you couldn't really tell if it was a skirt or a dress underneath.

Q Would you recognize this person if you were to see her again, that person?

A Yes, sir, I believe I would.

Q Would you look around the courtroom and see if she is present in the courtroom?

A Yes, sir, I believe she is. But the day that she came in the bank she had on an Afro wig, and of course that would make you look a little bit different. And I do notice she has a different hair style today.

Q Would you point out the person that you are referring to?

A It is the lady over there in the black.

MR. MORETON:

May the record show that the witness has identified the defendant Carolyn Bonds?

THE COURT:

Yes, the record may reflect that fact."

\* \* \* \* \* \*

"Q Other than the hair style and the clothes, do you notice any other distinguishing characteristics between the person that you saw when you opened that account and the lady that you have identified there?

A The main reason I noticed her was that her cheek bones were real high and she had on blush that day, and she seems to have on some blush today, which, you know, looks good. And I just notice makeup because I use to work in it. And her lips are the same size, and the same eye features."

On cross examination, Mrs. Bennett admitted that she had been unable to make a positive identification from photographs shown to her by the F.B.I.; that after a line-up she told the special agent that the defendant strongly resembled Estelle Johnson but that she could not be positive.

"Q And you are not telling this jury here today that you are in fact

positively identifying this defendant as being the same person whom you met and knew as Estelle Johnson, are you?

A I feel sure that it is the same person. But everytime I see her she is dressed different, looks different, and I don't think anybody should swear to something that is not the same that they saw the day that they were in process.

Q So, therefore, you are not positively identifying her?

A I wouldn't swear, no, sir."

The jurors and the district judge saw and heard Mrs. Bennett testify and were in much better position to assess the weight of her testimony than is this court. From a careful consideration of her entire testimony we are convinced that reasonable jurors could properly assess the apparent weakening of her testimony on cross examination as attributable to the skill of the defendant's attorney rather than to any inherent weakness in her testimony. Reasonable jurors could well accept Mrs. Bennett's testimony as proving beyond a reasonable doubt that the defendant and Estelle Johnson were and are the same person.

Finding no reversible error, the judgment of conviction is affirmed.

Affirmed.