**STATE of Utah, Plaintiff and Appellee,**

v.

**George Wesley HAMILTON, Defendant and Appellant.**

No. 890456.

Supreme Court of Utah.

Jan. 29, 1992.

Rehearing Denied Jan. 24, 1992.

R. Paul Van Dam, Charlene Barlow, Salt Lake City, for plaintiff and appellee.

G. Fred Metos, Salt Lake City, for defendant and appellant.

ZIMMERMAN, Justice:

Defendant George Wesley Hamilton appeals his conviction of second degree murder, a first degree felony. Hamilton raises three claims of error: (i) insufficiency of the evidence to support the conviction; (ii) failure to instruct the jury on the nature and effect of fingerprint evidence; and (iii) improper admission of evidence concerning other violent acts by Hamilton. With regard to Hamilton's first two claims, we find no error. As to the third claim, we need not reach the admissibility of the violent act evidence because, even assuming error, it was harmless. We therefore affirm Hamilton's conviction.

In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. *State v. Gardner,* 789 P.2d 273, 285 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965

(1990); *State v. McClain*, 706 P.2d 603, 605 (Utah 1985). We recite the facts accordingly. *Rollins v. Petersen*, 813 P.2d 1156, 1158 (Utah 1991); *State v. Verde*, 770 P.2d 116, 117 (Utah 1989).

Sharon L. Sant was a student at Southern Utah State College in Cedar City, Utah, during the summer of 1985. Around the end of July 1985, Sant told a friend, Cheryl Cox, that she intended to return to her hometown of Fillmore, Utah, to attend the funeral services of some high school friends. On August 1, after failing to obtain other transportation, Sant started to hitchhike from Cedar City to Fillmore. One of Sant's co-workers, Royce Barton, saw her at approximately 11:45 a.m. at a northbound on-ramp of Interstate 15 in Cedar City. She never arrived in Fillmore. Cox reported Sant missing on August 6, 1985.

Beginning in March 1985, defendant George Wesley Hamilton worked for Arnold Foch Parkinson on a ranch Parkinson leased north of Paragonah, Utah. Paragonah is twenty-two miles north of Cedar City on I–15, between Cedar City and Fillmore. Hamilton's co-worker on the ranch was Robert Bott. In early July, Hamilton stopped working full time for Parkinson. He then split his time between cutting firewood in the Paragonah area and working on the ranch. He continued to alternate between ranch work and woodcutting into early 1986.

On the morning of August 1, 1985, the owner of the ranch could not find Hamilton, Bott, or Parkinson on the ranch. Later that afternoon, while shopping at the M & D Market in Parowan, Utah, five miles north of Paragonah along I–15, Jacklyn Smith saw Hamilton and Bott in the store's parking lot. She saw Bott and a woman later identified as Sant seated in the cab of Hamilton's flatbed truck. She also saw Hamilton leave the store with a twelve-can pack of Budweiser beer, put the beer in the back of the truck, and then get into the driver's side of the truck cab. Hamilton, Bott, and Sant then drove away.

On August 16, 1985, a Utah Department of Transportation employee working near a frontage road and a northbound on-ramp of I–15 at Cove Fort, Utah, noticed some curious marks leading away from the road into some scrub trees. Upon investigation, he and two co-workers determined that they were drag marks. They followed the marks and discovered a small mound of dirt that had "sticks and an oily residue coming up through the dirt [to the] top of the mound." After the workers noticed what appeared to be a dried intestine on top of the mound, they left the area undisturbed and contacted police.

Officers of the Millard County Sheriff's Office arrived at the scene shortly thereafter. The officers opened the mound and found the unclothed, mutilated remains of a female. Both hands, feet, and breasts, the head, and the left arm had been removed. The left arm was in the grave between the legs of the torso. The body had been cut open from the breast bone to the pubic bone and the uterus and other sexual organs apparently had been removed. Sometime later, officers assisted by a canine team discovered breast tissue under a bush some thirty-nine feet from the grave. The deputy who discovered the tissue testified that there was "grease or a skid mark" about two feet long that led under the bush. "It was like the rolling of the dirt as if the item had struck the ground and skidded up underneath the bush." The other missing body parts were never recovered.

About seventy-five feet from the grave site, officers located a wood-splitting maul. The officers testified that the maul had been used in excavating the shallow grave. The maul carried traces of blood at the base of the metal head, on the wooden portion at the top of the head, and on the bottom of the handle. Investigators were unable to determine the blood type because there was an insufficient quantity of blood. The officers were likewise unable to recover fingerprints from the handle of the maul. Testimony at trial indicated that Ronald Frank Johnson, owner of a Parowan service station at which Hamilton was a regular customer, had seen a similar maul in Hamilton's truck in July 1985.

Johnson further testified that in November 1985, he had noticed that a similar, but newer, maul had replaced the one he had seen in July.

In addition to the maul, officers recovered a considerable amount of physical evidence from the crime scene, including blood stains and hair recovered from gravel at the edge of the roadway. The hair was found to be similar to samples of Sant's hair taken from her hair brush and clothing. Similar hair was also found in Hamilton's truck. In addition, the two-hundred-foot drag trail, which began at the road and ended at the grave, was spotted in numerous places with type O-positive human blood. Both Sant and Hamilton had this blood type. Specifically, officers recovered blood samples from stained soil and tree and sagebrush branches along the drag trail. Police testified that one area of the drag trail, which they called the "mutilation point," was particularly "covered with blood." Near this point, officers found a piece of cardboard with blood on it and a blood-stained beer bottle in the bushes. There were two bloody fingerprints on the bottle—one on the outside and one just inside the neck. The fingerprint on the outside was identified as Hamilton's. Although the other fingerprint had a whorl similar to one of Hamilton's, it did not have enough detail to positively identify it as his. Evidence showed that the beer bottle was manufactured between September and December of 1979. It would have been shipped to the bottler within thirty days of manufacture and filled and shipped immediately to the distributor.

Officers also collected five Budweiser cans near the drag trail. They lifted four latent fingerprints from two of the cans. Two of Hamilton's fingerprints were found on one can. Another of Hamilton's prints and a print of a man identified as Michael Perry were found on the second can. Evidence showed that three of the five beer cans were filled on July 2, 1985, and possibly were packaged together. The can with two of Hamilton's prints was one of these three. A fourth can, which had no identifiable prints, was packaged on July 1, 1985.

The fifth can, which had the fingerprints of Hamilton and Perry, was packaged August 5, 1985. A Budweiser representative testified that Budweiser cans packed in a twelve-pack purchased from the M & D Market in Parowan on August 1st were packaged on July 1 and 2, 1985.

Dr. Edwin Sweeney, acting state medical examiner, examined the remains of the body. Through comparison of X-ray records, Dr. Sweeney identified the remains as Sant's. He testified that the marks on the body were consistent with the removal of the head, hands, feet, and one arm with a blunt instrument, such as the wood-splitting maul found at the scene. He also testified that the incision in the torso was made with a sharp instrument such as a knife and that the incisions around the breasts were made with the same type of instrument. Although Dr. Sweeney testified that the presence of blood and hair samples that appeared "somewhat squashed or stuck" in the gravel near the road implied that the victim had suffered a blow to the head, without the head he was unable to determine the cause of death or whether the incisions and mutilation of the body occurred before or after death. The decomposition of the body, however, was consistent with Sant's dying on August 1st.

On January 29, 1986, an anonymous informant telephoned police and said that Hamilton might have participated in the Sant murder. After several weeks of investigation, both Hamilton and Bott were arrested and charged with first degree murder and aggravated kidnapping. The prosecutor granted Bott immunity, and he was never tried. Hamilton, on the other hand, was eventually tried on an amended information which charged second degree murder, aggravated sexual assault, and forcible sexual abuse. Hamilton was convicted of second degree murder; the aggravated sexual assault and sexual abuse charges were dismissed. Because of jury misconduct, the trial court set aside the conviction and ordered a new trial on the second degree murder charge. After the second trial, the new jury panel found

Hamilton guilty of second degree murder. Hamilton appeals his conviction from the second trial.

Hamilton makes three claims of error: first, that there was insufficient evidence that he participated in the murder of Sharon Sant; second, that the trial court erred when it refused to instruct the jury that before it could consider the fingerprint evidence against Hamilton, it must determine that the fingerprints at the scene were left at the time of the murder; and finally, that the trial court erred when it allowed the State to introduce evidence of his specific acts of violence against a witness who was not a victim of the crime with which he was charged. On the first point, Hamilton argues that the verdict should be reversed and the case remanded to the district court with an order that a judgment of acquittal be entered. On the second and third points, he contends that the judgment should be reversed and the case remanded for a new trial. We will consider each of Hamilton's claims separately.

■ We note the standard for review applicable to Hamilton's first claim. When a jury verdict is challenged on the ground that the evidence is insufficient, our scrutiny of the evidence is limited:

> [W]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.

*State v. Booker,* 709 P.2d 342, 345 (Utah 1985) (quoting *State v. Petree,* 659 P.2d

1. With regard to the "no reasonable alternative hypothesis" theory upon which defendant proceeds, we note that this court has previously indicated that this is only one way of stating the prosecution's burden of proof, which requires proof beyond a reasonable doubt. *State v. Eagle,* 611 P.2d 1211, 1213 (Utah 1980). Such an instruction need not be given in these terms in every circumstantial evidence case. *Id.* In the present case, the trial court did give a "no reasonable alternative hypothesis" instruction.

443, 444 (Utah 1983)); *accord State v. Verde,* 770 P.2d 116, 124 (Utah 1989); *State v. McCardell,* 652 P.2d 942, 945 (Utah 1982). We will not substitute our judgment for that of the jury. *State v. Lamm,* 606 P.2d 229, 231 (Utah 1980).

■ Hamilton points out that all the evidence used to convict him is circumstantial. Although he recognizes that a number of pieces of circumstantial evidence link him to Sant and the burial scene, the thrust of his insufficiency claim is that the only real evidence against him is the fingerprint evidence recovered from the bottle and the cans at the burial site. He relies on cases from other jurisdictions for the proposition that fingerprint evidence alone, especially when found on movable objects commonly located in places accessible to the public, is insufficient to support a conviction unless it can be shown that the fingerprints were left at the time and place of the commission of the crime. *See United States v. Corso,* 439 F.2d 956, 957 (4th Cir.1971); *Sorey v. State,* 419 So.2d 810, 812–13 (Fla.Dist.Ct. App.1982); *Fladung v. State,* 4 Md.App. 664, 668–69, 244 A.2d 909, 911 (1968); *Commonwealth v. Cichy,* 227 Pa.Super. 480, 483, 323 A.2d 817, 818–19 (1974). Essentially, he argues that the evidence here is insufficient because it does not exclude every reasonable hypothesis that the fingerprints might have been left at a time or place other than when and where the crime was committed.[1]

■ Hamilton's interpretation of the facts and law relative to the fingerprint evidence is incorrect. We first address the law. There are two general approaches to the weight that may be afforded fingerprint evidence. The first, which is based on an American Law Reports annotation,

We also note that although a jury can convict only upon proof beyond a reasonable doubt of all the elements of the charged crime, on appeal, we need not be convinced in our own minds beyond a reasonable doubt. Rather, we must uphold the jury verdict unless reasonable minds could not have found beyond a reasonable doubt that defendant committed the crime. *Verde,* 770 P.2d at 124; *Booker,* 709 P.2d at 345; *State v. Watts,* 675 P.2d 566, 568 (Utah 1983).

views fingerprint evidence with skepticism: "To warrant a conviction, the fingerprints corresponding to those of the accused must have been found in the place where the crime was committed under such circumstances that they could only have been impressed at the time when the crime was committed." Annotation, *Fingerprints, Palm Prints, or Bare Foot Prints as Evidence*, 28 A.L.R.2d § 29, at 1154 (1953); *see also Borum v. United States*, 380 F.2d 595, 596–97 (D.C.Cir.1967); *State v. Burton*, 144 Ariz. 248, 252–53, 697 P.2d 331, 335–36 (1985); *McNeil v. State*, 227 Md. 298, 300, 176 A.2d 338, 339 (1961); *Reed v. State*, 95 Nev. 190, 194, 591 P.2d 274, 276 (1979); *Knight v. State*, 185 Ga.App. 619, 622, 365 S.E.2d 484, 486–87 (1988). In addition, where only fingerprint evidence links the defendant to the crime, such evidence is insufficient to support a conviction. *Borum*, 380 F.2d at 596–97.

Some jurisdictions apply a variant of the first approach. While purporting to follow the A.L.R./*Borum* approach, they actually have modified it in practice. They appear to follow A.L.R./*Borum* only when questionable fingerprint evidence is the only evidence inculpating the defendant. *See Corso*, 439 F.2d at 957. In instances where additional evidence supports the conviction, these courts generally treat fingerprint evidence as they do other circumstantial evidence. They allow the trier of fact to determine the weight it is to be given. *See, e.g., United States v. Talbert*, 710 F.2d 528, 531 (9th Cir.1983), *cert. denied*, 464 U.S. 1052, 104 S.Ct. 733, 79 L.Ed.2d 192 (1984); *United States v. Phillips*, 664 F.2d 971, 1033 (5th Cir.1981), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Harris*, 530 F.2d 576, 579 (4th Cir.1976); *United States v. Bonds*, 526 F.2d 331, 337 (5th Cir.1976), *cert. denied*, 429 U.S. 843, 97 S.Ct. 121, 50 L.Ed.2d 113 (1976); *United States v. Roustio*, 455 F.2d 366, 370 (7th Cir.1972); *United States v. Scarpellino*, 431 F.2d 475, 478 (8th Cir. 1970).

The second approach treats fingerprint evidence like any other piece of circumstantial evidence whether or not there is additional evidence. For example, in *Mason v. Commonwealth*, 357 S.W.2d 667 (Ky.1962), the court observed:

It has been stated as the general rule that fingerprints alone will support a conviction only if they are found in the place where the crime was committed "under such circumstances that they could only have been impressed at the time when the crime was committed." To accept this choice of words would, it seems to us, refute the oft-repeated rule in this state that "if there is any evidence, however slight or circumstantial, which tends to show guilt of the crime charged or any of its degrees, it is the trial court's duty to submit the case to the jury." 

*Id.* at 668 (citations and emphasis omitted); *see also Bruce v. State*, 268 Ind. 180, 257–58, 375 N.E.2d 1042, 1082–83, *cert. denied*, 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662 (1978); *Wilcox v. State*, 356 So.2d 887, 889 (Fla.Dist.Ct.App.1978), *rev'd on other grounds*, 367 So.2d 1020 (Fla.1979); *People v. Willis*, 60 Mich.App. 154, 158–59, 230 N.W.2d 353, 356 (Ct.App.1975). This latter approach is in line with Utah case law. We have always treated fingerprint evidence like any other evidence and have never evaluated its sufficiency to support a conviction by a separate, more stringent standard. *See State v. Bailey*, 712 P.2d 281, 284 (Utah 1985); *State v. Jolley*, 571 P.2d 582, 585 (Utah 1977); *In re Marquez*, 560 P.2d 342, 343 (Utah 1977); *State v. Washington*, 17 Utah 2d 149, 150, 405 P.2d 793, 793 (1965).

Hamilton urges that we follow A.L.R./*Borum* and treat fingerprint evidence as though it is subject to reliability problems similar to those that affect eyewitness identification evidence. Science has shown eyewitness identification testimony to have inherent weaknesses that almost universally are unappreciated by jurors. Fingerprint evidence, however, presents no analogous accuracy problems. Questions that go to the weight to be accorded fingerprint evidence are fairly obvious and straightforward and are subject to complete illumination through cross-exami-

nation and jury argument. Thus, we find no reason to conclude that fingerprint evidence differs from any other circumstantial evidence. The jury can weigh it with the rest of the evidence in determining a defendant's guilt.

■ In the present case, when the fingerprint evidence is considered along with all the other evidence linking Hamilton to Sant and the crime scene, it is apparent that there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Hamilton had participated in the murder of Sharon Sant.

Closely related to Hamilton's insufficiency of the evidence claim is his second contention, i.e., that the trial court erred in refusing to give an instruction on the nature and effect of fingerprint evidence.

■ We first address the standard by which jury instruction rulings are reviewed. A trial court has a duty to instruct the jury on the law applicable to the facts of the case. *State v. Potter*, 627 P.2d 75, 78 (Utah 1981). The defendant has a right "to have his [or her] theory of the case presented to the jury in a clear and understandable way." *Id.* at 78; *see also State v. Smith*, 706 P.2d 1052, 1058 (Utah 1985). However, a trial court can refuse to give an instruction that misstates the law. *State v. Standiford*, 769 P.2d 254, 266 (Utah 1988); *State v. Wilcox*, 28 Utah 2d 71, 75, 498 P.2d 357, 359 (1972). And it "is not error to refuse a proposed instruction if the point is properly covered in the other instructions." *State v. Sessions*, 645 P.2d 643, 647 (Utah 1982); *Wilcox*, 28 Utah 2d

at 75, 498 P.2d at 359. Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness. *Ramon v. Farr*, 770 P.2d 131, 133 (Utah 1989); *Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1378 (Utah 1987).

■ The proposed fingerprint instruction the trial court declined to give essentially states that the jury cannot consider evidence of Hamilton's fingerprints on the cans and bottle unless the jury first finds that there is no possibility that Hamilton left the prints at a time other than during the commission of the crime.[2] Hamilton contends that this instruction was required because the fingerprint evidence might have misled the jury. Specifically, Hamilton contends that the fact that the prints were found at the scene of the crime might lead the jury to give them undue weight and to discount the fact that they were found on movable articles located in an area easily accessible to the public. In essence, Hamilton argues for a special cautionary instruction on fingerprint evidence analogous to the instruction we have required when eyewitness identification testimony is presented in a case. *See State v. Long*, 721 P.2d 483, 492 (Utah 1986); *see also State v. Ramirez*, 817 P.2d 774, 780 (Utah 1991). Because we have held that fingerprint evidence is not entitled to special treatment, the trial court did not err when it refused to give Hamilton's proposed instruction.[3]

2. Hamilton's proposed instruction is as follows:
The state has offered circumstantial evidence in the nature of fingerprints in this case. You are instructed to consider this evidence along with all other evidence in making your determination of whether the defendant is guilty or not guilty of the offense as charged in the information. However, before you may find the defendant guilty on the basis of fingerprint evidence, you must find that the print was made at the time of the incident for which the defendant is charged. However, if the circumstances are such that the print could have been impressed at a time other than that of the incident for which the defendant is charged, then you are not to consider the fingerprint evidence with respect

to the defendant's guilt. The circumstances to consider in determining whether the print was impressed when the crime was committed include, but are not limited to, the location of the print, the character of the place or premises where the print was found and whether the object would be inaccessible to the defendant except in the commission of the crime.

3. This does not imply that it is error for a trial court to give a cautionary instruction about fingerprint evidence, or any other type of evidence, where the prosecution's case is entirely circumstantial. We do not understand Justice Stewart to disagree on this point.

Turning to the final claim on appeal, Hamilton argues that the trial court erred in permitting the State to adduce testimony during its direct examination of Rita Weatherby, Hamilton's live-in girlfriend, that Hamilton had physically abused her prior to the time Sant was killed. Hamilton argues that this evidence violated rule 404 of the rules of evidence in that it allowed evidence of Hamilton's character that had no other evidentiary purpose but to show that Hamilton acted in conformity to his character. Hamilton also argues that the evidence was more prejudicial than probative under rule 403.

Before the examination that resulted in Weatherby's statements, the court held an in camera hearing on the testimony's admissibility. The State proffered evidence that Weatherby would testify that on three different occasions she had given police inconsistent statements concerning Hamilton's whereabouts on August 1, 1985. Her testimony would be that she had told police on two occasions that she was with Hamilton on August 1st. During a third interview with police, she said that she was not with Hamilton on August 1st and that she had lied earlier about being with him. The State proffered that Weatherby would say she had lied earlier because Hamilton had asked her to provide him with an alibi for August 1st and she had agreed to give it because she was afraid of him. She would testify that she was afraid of Hamilton because he had hit her during the time she lived with him.

■ Hamilton objected on two grounds to the admission of the evidence that he had struck Weatherby. First, he contended that the evidence was offered to prove that his killing Sant would be consistent with proof that violence against women was part of his basic character. Such evidence as to character is not admissible under rule 404(b). That rule requires that for the evidence of specific acts to be admissible, it must have some purpose other than proof that the charges against the defendant are consistent with his character, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity,

or absence of mistake or accident." Utah R.Evid. 404(b). The second ground for objecting to the evidence's admissibility was the likelihood that it would be unfairly prejudicial and should be excluded under rule 403. Utah R.Evid. 403.

The court overruled both objections. As to the 404(b) objection, the court reasoned that the evidence was admissible because "it is a direct statement relative to the very issue in the case here and relevant to a description of and actions of the defendant as it relates to his being a suspect in the homicide that is here being investigated." Regarding the 403 objection, the court said:

Now, as far as the prejudicial effect and as far as it being a specific instance of bad conduct—being assaultive—it is not an independent or an isolated one. This is one related to the very witness who could or could not provide him with what he wanted by way of an alibi, and his actions pertaining to his enforcement of that request. So that would not fall within the rule that you're citing there, and the court would deny the motion on that ground.

The evidence was then admitted. Although it is difficult to determine the precise basis for the admission of the evidence, it appears that the court found there was an independent basis for admission of the evidence outside of the specific exceptions listed in rule 404(b), namely, that it established that defendant was attempting to create a false alibi, a fact which raises an inference of an admission of culpability. The court also found that the probativeness of this evidence was not substantially outweighed by the danger of unfair prejudice and hence it satisfied rule 403.

■ In reviewing a trial court's ruling on the admissibility of evidence under rule 403, we will not overturn the court's determination unless it was an "abuse of discretion." *See Verde*, 770 P.2d at 120. To state the matter more precisely, we review the trial court's 403 ruling admitting or denying admission to evidence by deciding whether, as a matter of law, the trial court's decision that "the unfairly prejudicial potential of the evidence out-

weighs [or does not outweigh] its probativeness" was beyond the limits of reasonability. *See Ramirez*, 817 P.2d at 781–82 n. 3.[4] Of course, like any other evidentiary ruling, an erroneous decision to admit or exclude evidence based on rule 403 cannot result in reversible error unless the error is harmful. *See Verde*, 770 P.2d at 120. Therefore, even if we were to conclude that the evidence here was improperly admitted, that would not decide the issue. We still would have to determine whether the error was harmful. Conversely, we can make an examination of the correctness of the trial court's rule 403 ruling unnecessary by finding that any error was harmless. We follow that course here. We do not determine whether the evidence was admitted improperly, because we conclude that any error in its admission was harmless. *State v. Larson*, 775 P.2d 415, 419 (Utah 1989).

█ "Harmless" errors are "errors which, although properly preserved below and presented on appeal, are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *Verde*, 770 P.2d at 120; see also Utah R.Crim.P. 30(a); Utah R.Evid. 103(a); Utah R.Civ.P. 61. Although it is somewhat difficult to state exactly when an error is such that it would result in a "reasonable likelihood" of a different result, we have attempted to give a more concrete definition of such an error in *State v. Knight*, 734 P.2d 913 (Utah 1987), where we held, "For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *Id.* at 920. Here, the error is not one that undermines our confidence in the verdict.

█ In making this determination, we consider a host of factors including, among others, the importance of the witness's testimony to the prosecution's case and the overall strength of the State's case. *See State v. Hackford*, 737 P.2d 200, 205 (Utah 1987). The more evidence supporting the verdict, the less likely there was harmful error. *Id.* Here, the evidence consisted of testimony that Hamilton had been abusive to a woman on a prior occasion. It came during Rita Weatherby's testimony while explaining why she had lied about being with Hamilton on August 1, 1985. Clearly, evidence that Hamilton had acted violently toward a woman on a previous occasion was damaging evidence, and if it were the only evidence or one of the only pieces of evidence before the jury, we might well consider it so prejudicial as to undermine our confidence in the verdict. That is not the case here. Weatherby's statement, in the context of the entire case, is not so significant that it should be afforded great weight, especially when viewed against all the other evidence linking Hamilton to Sant and the burial site.

Because we conclude that there is no substantial likelihood that the outcome would have been different absent admission of this evidence on direct examination, we affirm the judgment of the trial court.

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

STEWART, Justice (concurring).

In my view, the trial court properly rejected the defendant's proposed instruction with respect to the weight the jury could give to the fingerprint evidence because the fingerprint evidence was not the only evidence linking the defendant to the crime and, more important, because the proposed instruction could have given the jurors the

---

4. In *State v. Larson*, 775 P.2d 415, 419 (Utah 1989), we casually stated that "to constitute an abuse of discretion, the error must have been harmful. *State v. Verde*, 770 P.2d 116, 120 (Utah 1989)." This statement is circular and erroneous. The portion of *Verde* cited only weighs the probative and prejudicial character of certain evidence and finds no error in its admission. It says nothing about harmless error. In *Larson* itself, our analysis was limited to determining the harmfulness of the alleged error, not the reasonableness of the trial court's ruling admitting the evidence. These two inquiries should not be analytically collapsed, and to the extent *Larson* suggests they are, it is wrong. Of course, a determination of harmlessness obviates the need to reach the question of error, *see Verde*, 770 P.2d at 123, but it is not a substitute for that analysis.

impression that they should consider only the fingerprint evidence on that point. On the facts of this case, the instruction could have been confusing and misleading.

Nevertheless, an instruction on fingerprint evidence along the lines of that proposed by the defendant may well be appropriate, or even mandatory, when there is no other significant evidence pertaining to identity. For example, if the only evidence linking a defendant to a crime is fingerprint evidence and ambiguous circumstantial evidence as to when the fingerprint was impressed, an instruction would be appropriate and, perhaps, required.

In addition, I do not believe that the admission of Rita Weatherby's statement that the defendant had hit her, made in the context of explaining why she had changed the alibi story that she had given to the police, was error. This Court has been careful to require that prior crime evidence have special relevance to the facts of the case, and I certainly do not suggest departing from that fundamental rule of fairness. Nevertheless, in this case, I believe that the statement was within our rules allowing for admissibility since it was highly relevant to explain Weatherby's alibi stories. *See generally State v. Forsyth,* 641 P.2d 1172 (Utah 1982). In my view, the majority's application of the harmless error doctrine is superfluous.