STATE of Utah, Plaintiff and Appellee,

v.

Theodis WHITE, Jr., Defendant and Appellant.

No. 930696–CA.

Court of Appeals of Utah.

Aug. 17, 1994.

Joan C. Watt (Argued), Lisa J. Remal, Salt Lake Legal Defender Ass'n, Salt Lake City, for appellant.

Jan Graham, State Atty. Gen., Kenneth A. Bronston (Argued), Asst. Atty. Gen., Salt Lake City, for appellee.

Before DAVIS, JACKSON and ORME, JJ.

## OPINION

DAVIS, Judge:

Appellant, Theodis White, Jr., claims that the trial court erred in its application of Utah Rule of Evidence 403 by admitting into evidence the blood-stained clothing of the individual he stabbed. We agree that the prejudicial effect of the introduction of the clothing substantially outweighed any probative value, but hold that the trial court's error was harmless.

## FACTS

At approximately 1:00 a.m. on May 23, 1993, David Egleston, Paul Keenan, and Kevin Barney were driving eastbound on 800 South in Salt Lake City. After Egleston moved into the left-hand turn lane to turn onto 300 East, a brown Celica pulled up beside them with three individuals in it. A confrontation began, involving yelling from both vehicles and offensive hand gestures. When Egleston turned north onto 300 East, the Celica followed, its occupants shouting for Egleston to pull over.

At that point Egleston tried to evade the Celica by making other turns and speeding south on 700 East. The Celica pursued Egleston's vehicle down 700 East with White leaning out the window the entire time, repeatedly threatening to kill all the occupants of the car, screaming "Tonight's your night," and waving a knife. Keenan described White at trial as "crazed" and "uncontrollably [angry]."

Because Egleston was concerned about the consequences of stopping the vehicle at a red light, he turned right onto 1300 South and quickly made a succession of other turns, ultimately winding up on a dead end road. Egleston was turning the car around just as the Celica arrived to block the exit. In order to escape, Egleston was forced to collide with the Celica, further infuriating the occupants of that vehicle.

Egleston returned to 700 East and sped off south to again attempt to lose the Celica. At 3300 South, Egleston turned right, drove to 500 East and then made a few more turns into a residential area. Believing they had finally shaken the Celica, the three young men got out of the car to inspect the damage caused by the collision. As they worked to pull the damaged fender away from the front tire, the Celica suddenly appeared and White emerged from the still moving car waving his knife.

Egleston immediately ran for the nearby 7–Eleven, and was soon followed by Keenan. Barney, however, thought that the other two were going to return to the car to make their escape, and jumped into the passenger seat. White leaned in through the open driver's window and began repeatedly stabbing him with the knife, screaming, "This is what you deserve, now you're going to die." Meanwhile, the driver of the Celica was yelling and pounding on the passenger window to Barney's right to try to get at him. The third passenger of the Celica, Twila Lu Jan, egged both men on, screaming, "Get him! Get him!"

Barney was stabbed eight times during the next five minutes as he attempted to block the knife thrusts and kick White away. Finally, Barney was able to grasp White's wrist and pull him off balance. Barney next pushed the passenger door open into the other individual and was able to escape by running to the 7–Eleven. Keenan testified

that Barney arrived at the 7–Eleven "carrying his guts" and "losing a lot of blood."

Dr. Dirk Noyes, the emergency room physician at L.D.S. Hospital who treated Barney, testified that Barney was stabbed in the right calf, the left thigh, the left elbow, the right elbow, the thumb, twice on the rib cage—one of which Noyes testified might have punctured the heart if it had not been blocked by a rib—and in the stomach. The six-inch deep wound to the abdomen had perforated the stomach, causing the omentum, a piece of fat attached to the stomach, to protrude from the stomach. Noyes testified that Barney would have died from this wound without surgery.

Detective Richard Judd questioned White about the incident on June 1, 1993. White initially told a confusing story regarding ownership of the knife, but did later admit that he stabbed Barney with the knife. White said that he had been drinking alcohol before the assault, but denied that he had taken cocaine "or anything."

White was charged with attempted criminal homicide, a second degree felony. Based upon the defense's indication that White was going to claim that he acted under diminished capacity at trial, the trial court appointed two experts to evaluate White's mental condition. Dr. Stephen Golding, a forensic psychologist, testified that White had diminished capacities because he suffered from "child sexual abuse syndrome," was permanently traumatized by a violent and chaotic family life, and was experiencing the "disinhibiting" effects of drugs and alcohol taken earlier.[1] One of the symptoms of "child sexual abuse syndrome," according to Golding, is the tendency to explode into uncontrollable rages in confrontational situations. Golding conceded that "child sexual abuse syndrome" was not listed as a possible diagnosis in DSM–III–R,[2] however he stated that he believed it would be included in the manual in the future. Further, Golding agreed that despite the

rage, defendant would probably have known that he held a knife in his hand.

The other expert appointed by the court, Dr. Mark Rindflesh, a forensic psychiatrist, testified that while White suffered from depression resulting from the assault, and substance abuse problems, he "found no other diagnosis [in DSM–III–R] for which [White] met the criteria." When specifically questioned about a possible "rage" disorder—"intermittent explosive disorder"—Rindflesh stated that neither he nor Golding believed that White had this disorder.

At trial, outside the presence of the jury, White objected to the introduction of Barney's blood-soaked clothing on the basis of Rule 403 of the Utah Rules of Evidence. White claimed that the exhibits were prejudicial in that the clothing would have an inflammatory effect on the jury, and that the probative value of the evidence was minimal given the victim's testimony regarding the wounds, the doctor's testimony as to the location and extent of the wounds, and the testimony of Keenan and Egleston about the blood they observed when Barney approached them at the 7–Eleven. The court ruled that the clothing was admissible on the grounds that it was not introduced to inflame the jury and that the clothing was part of the physical evidence of the case indicating "the nature of the aggression."

The jury convicted White of attempted murder. He appeals on the ground that there is a reasonable likelihood that the jury would not have convicted him if the blood-soaked clothing had not been admitted.

## STANDARD OF REVIEW

When reviewing a trial court's ruling regarding admissibility of evidence under Rule 403, "we will not overturn the court's determination unless it was an 'abuse of discretion.'" *State v. Hamilton,* 827 P.2d 232, 239 (Utah 1992) (citing *State v. Verde,* 770 P.2d 116, 120 (Utah 1989)). The Utah Supreme

---

1. White did not argue at trial that a drug and/or alcohol induced intoxication prevented him from forming the requisite intent for attempted murder.

2. The Diagnostic and Statistical Manual of the American Psychiatric Association Revised (DSM–III–R) is the authoritative reference cataloging what experts in the field currently believe to be mental illnesses.

Court has noted that the term "abuse of discretion" is not capable of precise definition. *State v. Pena,* 869 P.2d 932, 937 (Utah 1994). Instead, "a spectrum of discretion exists ... [and] toward the broad end of the spectrum is the decision to admit or exclude evidence under Utah Rule of Evidence 403." *Id.* at 938. The trial court has "considerable freedom in applying [Rule 403] to the facts, freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse." *Id.* at 937–38. Therefore, we will only conclude that the trial court abused its discretion if the ruling in favor of admissibility "was beyond the limits of reasonability." *State v. Menzies,* 235 Utah Adv. Rep. 23, 28, 1994 WL 110861 (Utah 1994); *Hamilton,* 827 P.2d at 239–40. Finally, even if we conclude that the trial court's decision regarding admissibility was in error, we will only reverse if the error was harmful, "i.e., if absent the error there is a reasonable likelihood of an outcome more favorable to the defendant." *State v. Dunn,* 850 P.2d 1201, 1221 (Utah 1993); *accord Hamilton,* 827 P.2d at 240.

## ANALYSIS

### Rule 403 Balancing Test

White argues that Barney's blood-soaked clothing constituted evidence with an "unusual propensity to unfairly prejudice, inflame or mislead the jury" and therefore the usual presumption of admissibility attaching to Rule 403 determinations does not apply, and the presumption instead favors nonadmissibility. In *State v. Lafferty,* 749 P.2d 1239 (Utah 1988), *cert. denied,* —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992), the Utah Supreme Court "recognized that inherent in certain categories of relevant evidence is an unusually strong propensity to unfairly prejudice, inflame, or mislead the jury" and that such evidence "is uniquely subject to being used to distort the deliberative process and improperly skew the outcome." *Id.* at 1256; *accord State v. Dibello,* 780 P.2d 1221, 1229 (Utah 1989); *State v. Moore,* 788 P.2d 525, 526 (Utah App.), *cert. denied,* 800 P.2d 1105 (Utah 1990). As a result, "when evidence falling into such a category is offered, we have required a showing of unusual probative value before it is admissible under Rule 403. In the absence of such a showing, the probative value of such evidence is presumed to be 'substantially outweighed by the danger of unfair prejudice.'" *Lafferty,* 749 P.2d at 1256 (quoting Rule 403); *accord State v. Dunn,* 850 P.2d 1201, 1221–22 (Utah 1993); *Moore,* 788 P.2d at 526–27.

The court in *Lafferty* enumerated three categories of evidence with an unusually strong propensity to unfairly prejudice a defendant. These are: (1) evidence of a rape victim's past sexual activities with someone other than the accused; (2) statistical evidence of matters not susceptible to quantitative analysis, for example, evidence regarding the veracity of a witness; and (3) gruesome photographs of a homicide victim's corpse. *Lafferty,* 749 P.2d at 1256. White argues that blood-soaked clothing should be included in the third *Lafferty* category because it "can be as gruesome as photographs and carry the same propensity for prejudice and distortion as gruesome photographs."

As the State points out, the dried blood on Barney's shirt and pants has the appearance of brown paint, "and while not particularly pleasant, [is] not gruesome." It is certainly not in the same category of evidence such as photographs the Utah Supreme Court has previously determined to be gruesome. *See id.* at 1257 (finding photographs of baby's repositioned body to expose gaping neck and blood covered face, mother's bloody corpse, and pool of blood on kitchen floor, "quite gruesome"); *Dibello,* 780 P.2d at 1230 (concluding that portion of videotape that lingered on victim's body and wounds "certainly qualifies as 'gruesome' under *Lafferty*"); *State v. Bishop,* 753 P.2d 439, 476–77 (Utah 1988) (finding photograph showing child victim's hole in skull and pair of tongs pulling skin away to reveal brain cavity "had great potential for unfairly prejudicing defendant"); *State v. Cloud,* 722 P.2d 750, 753 (Utah 1986) (noting that all parties conceded color photographs of victim lying both face up and face down in pool of blood were "very graphic and gruesome").

Because the clothing in this case is not gruesome, there is no requirement that the

State establish that the evidence has unusual probative value. Instead, the usual Rule 403 analysis applies, and a presumption exists that the evidence is admissible. *Moore,* 788 P.2d at 527; *Dibello,* 780 P.2d at 1229.

■ Rule 403 states in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." The term "unfair prejudice" has been interpreted to mean " 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " *State v. Maurer,* 770 P.2d 981, 984 (Utah 1989) (quotation omitted); *accord State v. Menzies,* 235 Utah Adv.Rep. 23, 28, 1994 WL 110861 (Utah 1994).

The trial court admitted the clothing pursuant to Rule 403, reasoning that

> the nature of the aggression is, in part, illustrated by the physical evidence of the clothing, and the bleeding that may be shown on it—*and I haven't seen the clothing yet*—is the result, alleged result of the conduct of the defendant in relation to the clothing, therefore, the court finds that it's part of the physical evidence of the case and appropriately admissible and not designed to inflame the jury.

(Emphasis added). The State argues that the trial court's ruling should be upheld, claiming "there was no better evidence than the clothes to prove that the victim's wounds were actually the result of a stabbing attack."

If the existence of a stabbing attack were at issue, the State would be correct. However, White conceded that he stabbed Barney.

In addition, Barney testified that White stabbed him, Lu Jan testified that she saw White making "stabbing motions" in the vehicle, Keenan testified that he saw White "go in on" Barney when Barney was trapped in the car, and Dr. Noyes testified about the nature and extent of the wounds. In light of this testimony and White's concession, the sole question for the jury concerned White's state of mind at the time the stabbing occurred. Therefore, the incremental probative value of the blood-soaked clothing in this case was minimal, if not nonexistent.

We also find error with respect to the other factor in the Rule 403 weighing analysis: the prejudicial effect of the introduction of the clothing. The trial court had not yet seen the clothing when it made its determination that introduction of the clothing was not designed to inflame the jury. We conclude, after viewing the clothing, that the extensive blood staining created a danger of prejudice that substantially outweighed the minimal or nonexistent probative value of the evidence.[3] *See State v. Bey,* 129 N.J. 557, 610 A.2d 814, 834 (1992) (where victim's clothing was irrelevant, trial court should exclude them because "victim-impact-type evidence always carries the risk that a jury will 'inappropriately intertwine[ ] irrelevant emotional considerations with relevant evidence' "); *Ellis v. State,* 651 P.2d 1057, 1061 (Okla.1982) (where no controversy exists as to location of wounds, blood-soaked shirt, tie and belt had no probative value and should have been excluded as prejudicial.).

In reaching this conclusion, we are mindful of the deference due the trial court's ruling concerning admissibility of evidence. None-

**3.** The State claims that we should be guided in our decision by *State v. Johnson,* 784 P.2d 1135 (Utah 1989). In *Johnson,* the Utah Supreme Court upheld the trial court's decision to admit a brown shirt with dried blood stains on the shoulder. The court noted at the outset that the probative value of the shirt was minimal at best because

> the shirt does not reveal who shot whom first or any other disputed fact. Neither was the uniform needed to prove the extent of the trooper's injury since that was never contested. And obviously, expert testimony, victim testimony, and photographs of an injury—are better resources for determining the magnitude of injury than a blood-stained shirt.

*Id.* at 1140–41. Nonetheless, the court determined, citing *Lafferty,* that "[a] brown shirt with dried blood on it does not equate with the evidence we have previously deemed highly prejudicial. Although admission of the trooper's uniform may have created some danger of prejudice, its probative value was not substantially outweighed by such danger." *Id.* at 1141 (footnote omitted). We see a significant difference between a brown shirt with some dried blood on the shoulder and Barney's cut up and blood-soaked white pants and blue and white striped shirt.

theless, in this case, the trial court's ruling was not reasonable, in part due to the fact that the court did not view the evidence before making its ruling, and in part due to the fact that the clothing had virtually no evidentiary value.

### Harmful Error

■ Despite the trial court's error in admitting the blood-soaked clothing, to merit reversal the appellant must demonstrate that the error was harmful. An error is harmful "when a reasonable likelihood exists that absent the error, the result would have been more favorable to the defendant." *State v. Dibello*, 780 P.2d 1221, 1230 (Utah 1989); *accord State v. Dunn*, 850 P.2d 1201, 1221 (Utah 1993). The reasonable likelihood of a more favorable result in the absence of the error exists if the reviewing court's "confidence in the outcome is undermined." *Dibello*, 780 P.2d at 1230; *accord State v. Bishop*, 753 P.2d 439, 477 (Utah 1988). White contends that harmful error occurred in this case because "[c]onsidering Dr. Golding's testimony combined with the evidence which suggested that Theo was out of control or acted in a blind rage, a reasonable likelihood exists that had the prejudicial clothing not been admitted, the jury would not have convicted [White]." [4]

In closing argument, White's counsel conceded that White stabbed Barney and that Barney was seriously injured. Therefore, the only remaining question for the jury to determine was whether White had the intentional or knowing state of mind required for conviction of attempted murder pursuant to Utah Code Ann. § 76–5–203 (Supp.1994). In addition to the undisputed testimony from Dr. Rindflesh that White's mental condition at the time of the assault would not be classified by the leading diagnostic manual as a mental illness or defect, there was testimony from the officer who interviewed White at the police station that White admitted the stabbing. A jury could reasonably conclude from this testimony that White engaged in conduct "knowingly," that is, "aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Utah Code Ann. § 76–2–103(2) (1990).

The presence or absence of the blood-stained clothing would be wholly irrelevant to the jury's determination of which expert to believe concerning White's mental state, and in fact, even if the jury had believed Dr. Golding concerning White's diminished capacity, Dr. Golding also testified that despite this diminished capacity, White probably "knew" that he had a knife in his hand. By extension, the jury could conclude that White also "knew" that his conduct was reasonably certain to cause Barney's death.

Finally, the potential for prejudice due to introduction of the clothing was minimized by the way these exhibits were used by the State. The only time there was any reference to the exhibits was when the prosecutor requested that the victim point out where the knife penetrated the clothing. This decision not to "unduly emphasize or otherwise misuse" the evidence was one of the factors the Utah Supreme Court found persuasive in concluding that harmful error did not occur in *Lafferty*. *State v. Lafferty*, 749 P.2d 1239, 1257 (Utah 1988), *cert. denied*, —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992); *cf. State v. Cloud*, 722 P.2d 750, 755 (Utah 1986) ("This is not a case ... in which improperly admitted evidence is peripheral. Rather, the improperly admitted photographs here were the focus of much of the prosecutor's presentation of his case, and the inference is strong that they were used primarily to inflame the jury. Under the circumstances, we cannot say that their admission was harmless error.").

### CONCLUSION

The trial court's ruling admitting Barney's blood-soaked clothing into evidence was be-

---

4. White also contends that evidence was presented that he had taken drugs on the night in question and was not taking the medication required for his epileptic condition. However, the evidence was contradictory regarding White's drug usage, and White has not cited to any testimony that indicates his mental capacity was diminished because he was not taking anti-seizure medication.

yond the limits of reasonability and therefore in error. However, considering the fact that the weight of the testimony supports the jury's decision that White had the required mens rea to support a conviction for attempted murder, and the lack of emphasis given by the State to the clothing, it is unlikely that the jury's verdict would have been more favorable to White if the clothing had not been introduced. Accordingly, we affirm.

JACKSON and ORME, JJ., concur.