**Flora HUERTA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13-81-260-CR.**

**(No. 2126cr).**

Court of Appeals of Texas,
Corpus Christi.

May 27, 1982.

---

Douglas Tinker, Tinker & Tor, Corpus Christi, for appellant.

William B. Mobley, Jr., Dist. Atty., Corpus Christi, for appellee.

Before NYE, C. J., and BISSETT and GONZALEZ, JJ.

## OPINION

GONZALEZ, Justice.

This is an appeal from a conviction in a "battered child syndrome" murder case. Husband and wife were tried jointly before a jury. Wife (appellant) was convicted of murder and sentenced to fifty years. Her husband was found guilty of criminally negligent homicide and sentenced to twelve months in the county jail and a Two Thousand Dollar ($2,000.00) fine. Wife only appealed.

Appellant challenges the sufficiency of the evidence to support the conviction and raises several other points of error. We affirm.

The indictment alleged that appellant and Jose Huerta (her husband) on or about the 5th day of September 1979 "did then and there with the intent to cause serious bodily injury to Jose Huerta commit an act clearly dangerous to human life that caused the death of Jose Huerta, namely the act of striking the said Jose Huerta in the head with an object the description of which is unknown to the Grand Jury."

The first witness to testify was Dr. Leonilo Garcia, M.D., a pediatrician. Dr. Garcia testified that on June 19, 1979, appellant brought a baby to his office for a consulta-

tion. Appellant told the doctor that she was the child's mother and that the child's name was Jose Guadalupe Huerta, Jr. and that his date of birth was March 29, 1979. The baby was suffering from diarrhea. Dr. Garcia again saw the child on June 21, 1979 and found that the child's left leg (femur) was broken. The baby was referred to Driscoll Foundation Children's Hospital. The leg was set and a body cast was placed on the child. The child was released from the hospital two days later.

On July 9, 1979, Dr. Garcia saw the child again and the baby was doing fine. The body cast was removed.

He next saw the baby on September 5, 1979 at 2:00 o'clock p. m. in the emergency room of Memorial Medical Center. The baby was purple, not breathing and without a heartbeat. The baby was resusitated, placed in a life support system and x-rays were taken.

Appellant had brought the baby to the hospital and shortly thereafter the appellant's husband arrived. Dr. Garcia informed the couple that their baby was in critical condition. Jose Huerta, the father, then asked if he could leave to go back to work. Dr. Garcia asked the appellant if she was going to stay but she said no, that she had to take her husband to work. Nonetheless, appellant stayed and was informed that the x-rays showed several broken ribs and a radiating skull fracture. Appellant inquired if these injuries could have been received when she patted the baby on the back or when the hospital staff administered C.P.R. (cardiopulmonary resusitation) to the baby in the hospital. Dr. Garcia testified the broken ribs definitely did not happen at the hospital because the x-rays revealed that the process of healing had begun. The radiating skull fracture was fresh, and the doctor found several bruises on the scalp of the child in various stages of healing.

The next witness was Dr. Alvaro Jesus Ramos, M.D., a pediatric radiologist at the Driscoll Foundation Children's Hospital. He testified that the x-rays taken of the victim, Jose Huerta, Jr. on June 21, 1979,

(date body cast placed on the child for broken leg) showed no broken ribs.

The next witness was Dr. David Burke Strone, M.D., radiologist at the Memorial Medical Center. He took x-rays of Jose Huerta, Jr., on September 5, 1979, when the baby was brought unconscious to the emergency room. The x-rays showed several broken ribs which were approximately two weeks old and the fracture of the long bone in the upper left thigh in an advanced state of healing. The doctor further testified that according to the September 5, 1979 x-rays, the child had suffered a recent, acute, radiating skull fracture which would have most certainly produced unconsciousness. The doctor's testimony continued as follows:

Q (District Attorney) "Considering the skull fracture, what type of force on a child five months old would cause that type of skull fracture?

A It takes a heavy force directed directly at the child's skull. A glancing blow, like running, glancing by a door wouldn't do it. It takes a heavy blow directly to the skull.

Q Would a—

A Any sort of blunt object could do it."

Dr. Strong concluded that the skull fracture, three broken ribs, and a broken femur—that occurred at different times in unrelated injuries brought this case within the diagnosis of "battered child syndrome."

The next witness, Vicky Lynn Page, testified that she was a nurse for Dr. Rufino Gonzales and that the body cast placed on Jose Huerta, Jr., for his broken leg was removed on July 20, 1979.

Susan Daniel, a crisis intervention nurse at the Memorial Medical Center, testified that she was on duty on September 5, 1979, when the appellant brought the baby to the hospital. Her job entailed transmitting information concerning the condition of the baby to the appellant and her husband, and getting medical history from them. Neither the appellant nor her husband could give an explanation of the child's condition. She explained the critical nature of the

child's condition to both of them and witnessed Dr. Garcia's conversation with them. When confronted with the fact that the child had several broken ribs that had been broken some time earlier, the appellant's only explanation was that when she found the baby not breathing she had hit him on the chest.

Dr. Blake O'Lavin, M.D., a neurologist who examined the baby on September 6, 1979, testified that the baby had no brain activity and was clinically dead when he examined him. The doctor's opinion as to the cause of death was that the baby died of a head injury causing severe brain damage related to the skull fracture.

Flora de Martinez, appellant's mother, testified that her daughter lived across the street from her; that appellant exclusively had care, custody and control of the baby, and that she never left the care of the child to her husband. She further testified that at approximately 11:30 o'clock a. m. on September 5, 1979, the appellant brought the baby to her house. The baby was not breathing, and she told the appellant to take the baby immediately to the hospital. She also testified that the baby was a sickly child and that he cried all the time.

Dr. Joseph Rupp, the Nueces County Medical Examiner was the next witness. He performed an autopsy on the baby. He found that the baby had what appeared to be fading bruises in the scalp. He found four broken ribs and testified that they were probably weeks or maybe even a couple of months old. He also found the radiating skull fracture and testified that in his opinion it was probably received the night before the baby was brought to the hospital. This skull fracture according to Dr. Rupp was the cause of death. He testified that it was caused by the baby being struck on the head with a solid object. Dr. Rupp further testified that normally in a case of the "battered child syndrome," one of the parents is an active abuser and the other is passive, in that he or she knows what is going on, but does nothing about it. He further stated that after a child is hurt badly, the abuser normally hesitates bringing the child in to the hospital for medical treatment because on the one hand they do not want the child to die, but on the other, they fear detection and prosecution.

Dr. Rupp explained how it would take a tremendous blow to break a six month old child's bones as they are still developing and are akin to hard rubber.

The State rested and appellant's motion for judgment of acquittal was denied.

The first witness for the defense was Pete Martinez, appellant's brother. He testified that from the time the appellant and her husband brought the baby from Mexico until its death some four months later, the child was constantly ill. He also testified that the appellant's husband would normally leave for work each day between 6:00 or 6:30 a. m. and would return between 5:30 or 6:00 p. m. On September 5, 1979, Pete Martinez accompanied the appellant to the hospital, but denied any knowledge of the broken ribs or skull fracture. He also described the three room house in which the appellant, her husband and the baby lived.

The next witness was Dora Cano, appellant's niece. She testified that the appellant took care of the child and that appellant's husband never handled the child. She also testified that the child was "very fussy" and that her own children were never like that, that the baby was constantly sweating, had a funny stomach and was "weird, as far as I was concerned."

Appellant testified in her own behalf. She testified that she could not have children, that when she found that a baby was available in Mexico, she, on June 3, 1979, went to a hospital in Reynosa, Mexico, and paid 500 pesos to the hospital and obtained the baby from his natural mother; that the baby cried all the time and that he was always perspiring and had a bloated stomach.

She testified further that on June 20, 1979, while she was outside hanging some of the baby's diapers she heard the baby cry; that she ran inside and found that the baby had fallen off the bed, between it and the wall; that she pulled him out and gave

him his bottle; that the next day she took him to the hospital at which time the broken leg was discovered; that on August 31, 1979, the child fell off the front seat of their automobile when she swerved to avoid a collision; that on September 5, 1979, she placed the baby on the bed surrounded by pillows and went to the other rooms and started her chores, that her mother called on the telephone twice while she was cleaning house and after the second phone call she found the baby lying face down on the bed, that she then took the baby to the hospital, that she loved the baby and took constant care of it; that the baby was constantly sick and cried quite a bit, but that she did not get tired staying up every night, taking care of him, and that after the baby broke his leg and was in a body cast, she did not mind changing his diapers and never complained to anybody about this. Appellant denied ever hitting the baby and testified that she did not know how the broken ribs or skull fracture could have happened. She further testified that her husband Jose Huerta was never alone with the baby.

Appellant's husband also testified. He testified that his wife took exclusive care of the baby and that his only contact with the victim was with "his eyes," that he had no idea how the broken ribs or skull fracture had happened and denied ever hitting the baby. He stated that the baby cried, "too much."

The State then called John D. Blanton, the foreman of the Nueces County Grand Jury who returned the indictment. He testified that the nature of the object which caused the death of the baby was unknown to the Grand Jury.

Mary Katherine Gomez was the next witness for the State and she testified that she was a nurse and that she worked for Dr. Leo Garcia. She stated that she was surprised by the appellant calling the doctor's office on two occasions and being more concerned about getting the body cast off the baby so that she could change his diapers more easily than she was about whether his broken leg was healing properly.

As is evident, the conviction was based solely on circumstantial evidence. Appellant does not challenge the identity of the victim or the fact that the death was caused by the criminal act of another. She contends that the evidence is insufficient to support the conclusion that she committed the criminal act.

The test for reviewing circumstantial evidence cases on appeal is whether there was evidence from which the jurors, having been advised of the restrictions the law places upon them in condemning one upon circumstantial evidence, *might reasonably conclude* that every reasonable hypothesis, other than the defendant's guilt, was excluded. *Moore v. State,* 532 S.W.2d 333 (Tex.Cr.App.1976). (emphasis added) Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support conviction. *Stogsdill v. State,* 552 S.W.2d 481 (Tex.Cr.App.1977).

"In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all incriminating circumstances. (citations omitted). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a *reasonable* one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. (citations omitted)." *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Cr.App.1977). (emphasis added).

In the case at bar, appellant's own testimony showed that she had exclusive care and control of the baby. This fact was corroborated by several witnesses. Her conduct toward the baby when the baby had a body cast (she apparently was more concerned about her burden of changing diapers with a body cast rather than the

baby's health), her conduct at the hospital and testimony of her husband and her own testimony led the jury to conclude that she was the active abuser and her husband the passive abuser.

While none of these facts point directly and independently to appellant's guilt, they need not do so. The jurors were properly instructed on the law of circumstantial evidence. All twelve of them were satisfied, beyond a reasonable doubt, that the conclusion of guilt was warranted by the combined and cumulative force of all the incriminating circumstances. In other words, the jury concluded that every reasonable hypothesis, other than the guilt of appellant for murder was excluded.

Based on the combined and cumulative force of all the incriminating circumstances, the jury's verdict is reasonable. The evidence is sufficient to sustain the conviction. See: *Earnest v. State*, 68 Tex.Cr.R. 542, 152 S.W. 638 (Tex.Cr.App.1912). Appellant's grounds of error one and two are overruled.

In appellant's third and fourth grounds of error, appellant contends that the trial court erred in overruling her motion for instructed verdict of not guilty because prior to such motion the State failed to prove the Grand Jury was unable to find what kind of weapon or instrument was used and even after the State attempted to prove this matter, there is no evidence to show what efforts, if any, the Grand Jury made to find same.

After the appellant presented her motion for an instructed verdict, the court allowed the State to reopen the case.

As previously mentioned, thereafter, John D. Blanton, foreman of the Grand Jury which indicted the appellant, testified that "we received no description that I can recall of an object that brought about the death." When asked whether the description was "known or unknown to the Grand Jury," Blanton stated, "It was not known."

▬ There was no testimony from an eyewitness or an accomplice witness, if any existed. No murder weapon was found nor confessions given. Under the circumstanc-

es, it appears that additional investigation by the Grand Jury could not have made certain the exact manner or means or the instrument used to inflict fatal blow. We find that the evidence was sufficient to prove the allegations in the indictment. *Simon v. State*, 488 S.W.2d 439 (Tex.Cr.App. 1972); *Anderson v. State*, 479 S.W.2d 57 (Tex.Cr.App.1972); *McNiel v. State*, 131 Tex.Cr.R. 553, 100 S.W.2d 365 (Tex.Cr.App. 1937). Appellant's third and fourth grounds of error are overruled.

Appellant contends in her fifth ground of error that the trial court erred in commenting on the witness Blanton's testimony during the trial.

Blanton, in addition to testifying that the description of the weapon or instrument used to commit the act was unknown to the Grand Jury, testified that the only person who appeared before the Grand Jury was the assistant district attorney who presented the facts of the case. On cross-examination, Blanton was asked if the indictment in this case was based on hearsay information. Blanton replied that the Grand Jury is "not bound by the same rules that a lawyer is . . ." This answer was then objected to and an exchange between defense counsel and the trial judge followed:

MR. LONGORIA: (Defense Attorney) "Objection, Your Honor, unless this man knows precisely what hearsay is, I don't think he is a lawyer. Of course, they don't hear hearsay, because no one is there from the defense to object to it being hearsay. If somebody told—. . .

THE COURT: In a proceeding of that nature, I don't believe that is concluded to be hearsay, Counsel and technically the witnesses' recitations of facts are correct."

▬ To constitute reversible error, the court's comments must be such that they are reasonably calculated to benefit the State or prejudice the rights of the defendant. *Jenkins v. State*, 488 S.W.2d 130 (Tex. Cr.App.1972); *Minor v. State*, 469 S.W.2d 579 (Tex.Cr.App.1971); Tex.Code Crim.Pro. Ann. art. 38.05 (Vernon Supp. 1981).

In the case at bar, the trial court only alluded to the fact that the Grand Jury is not bound by the same rules of evidence concerning hearsay as the trial court. This did not amount to a comment on the weight of the evidence by the trial judge. Even if it did, there was no objection to the comment of the judge, thus, it is not properly before us for review. Appellant's fifth ground of error is overruled.

Appellant in her sixth, seventh and eighth grounds of error contends that she and her co-defendant were tried together and that the court erred in not instructing the jury that each defendant must be considered separately.

Appellant argues that by grouping the defendants together, the court permitted the jury to find guilt if they believed either one of the defendants were guilty. In addition it is argued that the error was compounded by the failure of the trial court to instruct that the facts concerning each defendant should be considered separate and apart from the other. The ground of error does not comport with the trial objection, and, therefore, presents nothing for review. *McManus v. State*, 591 S.W.2d 505, 525 (Tex.Cr.App.1979); *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr.App.1976).

The parties consented to a joint trial. (No motion for severance was filed.) Also these matters were not raised at the trial when counsel made their objections to the court's charge to the jury.

At the trial, appellant only made a general objection to paragraphs 10 and 11 of the charge. These paragraphs deal with the lesser included offense of involuntary manslaughter. This objection was insufficient to preserve any error on the matters appellant complains on appeal. *Cherry v. State*, 488 S.W.2d 744 (Tex.Cr.App.1972); *Harrington v. State*, 424 S.W.2d 237 (Tex. Cr.App.1968). Furthermore, the trial court's charge on parties to an offense was authorized by the evidence. Appellant's grounds of error six, seven and eight are overruled.

In grounds of error nine and ten, appellant alleges that the charge was fundamentally defective in failing to grant an instructed verdict concerning appellant's husband, Jose Huerta, because the State in his absence would not have been entitled to a charge on parties to a crime.

Appellant cites no authority for this proposition. No objection was made to the trial court's charge on the law of parties. Failure to object to the charge limits our review to fundamental error. The charge does not come within the purview of any fundamentally defective errors that have been recognized by our courts in that it *does not*:

(1) authorize a conviction without proof of an allegation in the indictment which is required to prove;

(2) authorize a conviction on a different theory than alleged in the indictment;

(3) authorize a conviction on the theory alleged in the indictment and on additional unalleged theories, nor

(4) authorize a conviction for conduct which is not offense. See *Cumbie v. State*, 578 S.W.2d 732 (Tex.Cr.App. 1979).

Appellant's grounds of error nine and ten are overruled.

The judgment of the trial court is affirmed.