STATE of Utah, Plaintiff and Appellee,

v.

Gerald Gene BLUBAUGH, Defendant and Appellant.

No. 940060–CA.

Court of Appeals of Utah.

Sept. 28, 1995.

James G. Clark (argued), and Randall K. Spencer, Provo, for Appellant.

Kris C. Leonard (argued), Assistant Attorney General, Jan Graham, State Attorney General, Salt Lake City, for Appellee.

Before Judges DAVIS, BILLINGS, and GREENWOOD.

## OPINION

DAVIS, Associate Presiding Judge:

Gerald Gene Blubaugh appeals his conviction of murder, a first degree felony, for the death of fourteen month old Faith Barney. *See* Utah Code Ann. § 76–5–203(1)(c) (1995). We affirm.

## FACTS

Christy Barney gave birth to Faith on May 20, 1991. Christy was sixteen years old at the time. When Faith was two months old, she was placed in foster care due to Christy's pattern of neglect and alcohol abuse. After giving up alcohol (allegedly) and returning to school, Christy regained custody of Faith when Faith was five months old.

In February 1992, Christy met defendant and the two moved in together shortly thereafter. During the time period that defendant lived with Christy, Faith experienced a number of injuries. Among these were two broken arms and trauma to her skull. Defendant admitted striking Faith "up to eight times," but alleged that he merely tapped her lightly on the head with the tips of his fingers.

For several weeks in the spring of 1992, Christy and defendant lived in Rona Harding's basement. At trial, Harding testified that during that time she observed several instances of inappropriate child care on defendant's part. Of particular relevance to this case was defendant's technique for getting Faith to fall asleep. Harding testified that when Faith was "fussy," defendant's habit was to place her in the "fetal position"—head in the crook of one elbow, buttocks in the hand of the same arm. He would then put his other arm behind her knees, fold her knees to her chest, compress her body tightly, and hold her eyes shut with his fingertips. If Faith screamed or attempted to arch her body out of this position, Ms. Harding said that defendant would "squeeze her tighter until her face turned red and then she couldn't breathe very well."

When Harding objected to this practice, pointing out that defendant was cutting off Faith's circulation, defendant replied that "babies that was fussing liked the comfort of the fetal position." Defendant would then hold Faith tighter. Harding stated that defendant would hold Faith in this position "[f]or hours."

Faith suffered severe injuries sometime between 10:00 p.m. on August 4th and 8:00 a.m. on August 5th, and she died from those injuries shortly thereafter. Defendant and Christy were the only individuals present with Faith during this time period.

On the day of August 4th, Faith was apparently feeling ill. She had a fever and had not eaten much. Defendant had some training as a medic in the army, so when he arrived home from work, Christy asked him to care for Faith. The testimony at trial was that due to defendant's medical training he was generally the primary caregiver when Faith was ill. After Faith had a cool bath, defendant gave her a suppository and diapered her. The three remained together until about midnight when Christy put Faith in her crib and defendant and Christy went to bed.

The next morning, defendant woke Christy before he left for work at about 5:00 a.m. and told her to check on Faith because Faith was making a gurgling, percolating sound. Faith had asthma and commonly experienced difficulty breathing. Christy testified at trial that Faith was limp and did not wake up when she picked her up out of the crib, so Christy held Faith and rubbed her back until her breathing improved. Christy then placed Faith in the crib on her back and returned to bed.

Christy testified that she woke up again at 8:00 a.m., much earlier than she usually would, with an inexplicable and compelling feeling that something was wrong with Faith. She stated that she awoke upside down in the bed and had sensations similar to those she experienced when coming out of memory blackout episodes. Christy had a background of extensive physical and sexual abuse, and experts testified that she had developed a dissociative identity disorder as a response. This condition was characterized, in part, by frequent "blackouts." When Christy was twelve or thirteen, she experienced blackouts involving violence towards

family members. Although subsequent blackouts apparently did not involve the same degree of violence, the psychologists at trial testified that Christy was certainly capable of extreme violence during a blackout.

When Christy went in to check on Faith, she found her lying on her stomach and noticed the crib sheet around her mouth was wet. Faith's eyes were rolled back in her head and her skin was gray and cold. Christy picked Faith up and ran to the neighbor's house to call the ambulance.

The paramedics transported both Faith and Christy to Mountain View Hospital in Payson, Utah. Dr. Brian E. Shiozowa, the attending physician, determined that Faith was critically ill and stabilized her condition so that she could be lifeflighted to Primary Children's Hospital in Salt Lake City, Utah. He noted that she had a cast on her right arm and had a black eye that was one to three days old. During the next forty-eight hours at Primary Children's, Faith's brain began to swell due to fluid build up, causing irreversible brain damage. Faith was removed from life support systems and died August 8, 1992.

The autopsy revealed that Faith had suffered contemporaneous cranial and vertebral injuries. Specifically, her skull was fractured, her scalp was bruised in several places, and the instraspinous ligaments in her upper back were torn apart. The cause of Faith's death was anoxia (deprivation of oxygen to the brain) caused either by the skull injury or the back injury. The skull injury was described by Dr. Helen Britten, a specialist in child nonaccidental trauma at the University of Utah and Primary Children's Hospital, as the result of an unusually strong blunt force injury. That is, an injury caused by a hand or other blunt object,

equivalent in force to a fall from a second story window onto cement. With respect to the back injury, the medical examiner testified that "[t]he only mechanism that I know of that can cause that type of injury is if the person is bent forward at the chest and bent forward so much it would be a very abnormal anatomic position such that those ligaments would be torn loose." At that time, Faith was twenty-nine and one-half inches long, and weighed twenty-three pounds.

Both defendant and Christy were charged with first degree murder for Faith's death. Christy ultimately pled guilty to felony child abuse. After a six day jury trial, defendant was convicted of "depraved indifference" murder, in violation of Utah Code Ann. § 76-5-203(1)(c) (1995).[1] Defendant was sentenced to an indeterminate term of five years to life in the Utah State Prison.

## ISSUES

Defendant raises numerous points of alleged error on appeal. We discuss the following: (1) whether the evidence was sufficient to convict defendant; (2) whether the trial court erred in excluding some of the evidence of Christy's prior violent acts when in a memory blackout; (3) whether it was error to admit evidence of child abuse syndrome; (4) whether the trial court erred in refusing to suppress certain evidence; (5) whether the depraved indifference jury instruction given was erroneous; (6) whether the statute under which defendant was convicted is unconstitutional; (7) whether error occurred when the court mentioned defendant's potential punishment to the jury; (8) whether the trial court erred by denying defendant's motion for a bill of particulars; and (9) whether the prosecutor committed prejudicial error in closing argument.[2]

---

1. This statute provides, in relevant part:

    (1) Criminal homicide constitutes murder if the actor:
    . . . .
    (c) acting under circumstances evidencing a depraved indifference to human life engages in conduct which creates a grave risk of death to another and thereby causes the death of another. . . .
    Utah Code Ann. § 76-5-203(1)(c) (1995).

2. Defendant also contends that error occurred when the trial court "excluded evidence of abusing parent syndrome," and that there was insufficient foundation for Carol Brumfield's and Rona Harding's testimonies. We have considered these arguments and determine them to be without merit. Accordingly, we do not discuss them further. See State v. Allen, 839 P.2d 291, 303 (Utah 1992) ("In accord with the established principles of review applicable to all cases, civil and criminal, we decline to analyze and address

### 1. *Insufficiency of the Evidence*

■ Defendant was convicted of depraved indifference murder pursuant to Utah Code Ann. § 76–5–203(1)(c) (1995). The elements of this offense are: (1) engaging in conduct creating a grave risk of death to another that resulted in the death of that individual (the "actus reus"); (2) knowing that this conduct or the circumstances surrounding this conduct created a grave risk of death to this individual (the "mens rea"); and (3) acting "under circumstances evidencing a depraved indifference to human life—a qualitative judgment to be made by the jury in determining the extent of the defendant's conduct. It is not a description of the mens rea involved in the commission of the crime, but an evaluation of the actus reus." *State v. Bolsinger,* 699 P.2d 1214, 1219 (Utah 1985); *see also State v. Powell,* 872 P.2d 1027, 1029–30 (Utah 1994); *State v. Standiford,* 769 P.2d 254, 262 (Utah 1988).

■ Defendant challenges the sufficiency of the evidence to convict him of depraved indifference murder.[3] In reviewing a challenge to the jury verdict for insufficiency of the evidence, we "must view the evidence in the light most favorable to the verdict and will interfere only when the evidence is so lacking and insubstantial that a reasonable person could not possibly have reached a verdict beyond a reasonable doubt." *State v. Tanner,* 675 P.2d 539, 550 (Utah 1983), *superseded on other grounds, State v. Walker,* 743 P.2d 191, 193 (Utah 1987); *accord State v. Morgan,* 865 P.2d 1377, 1379 (Utah App. 1993).

■ It is well accepted that "circumstantial evidence alone may be competent to establish the guilt of the accused." *Tanner,* 675 P.2d at 550. In fact,

[i]f circumstantial evidence and reasonable inferences were to be discounted, it is doubtful that convictions would ever be found in cases of this nature where the crime takes place in the home and where the youth of the victim, combined with the relationships of the family members, makes it difficult, if not impossible, to obtain direct evidence.

*Id.* at 551. In this case, defendant contends that because the evidence is circumstantial, "if any reasonable alternative inference exists [that Christy was the perpetrator], then reasonable doubt exists as a matter of law." As the Utah Supreme Court observed in *State v. Schad,* 24 Utah 2d 255, 470 P.2d 246 (1970), "This is entirely logical, because if the jury believes that there is a reasonable hypothesis in the evidence consistent with the defendant's innocence, there would naturally be a reasonable doubt as to his guilt." *Id.,* 470 P.2d at 247.

However, the *Schad* court's analysis continued:

Nevertheless, that proposition does not apply to each circumstance separately, but is a matter within the prerogative of the jury to determine from all of the facts and circumstances shown; and *if therefrom they are convinced beyond a reasonable doubt of the defendant's guilt, it necessarily follows that they regarded the evidence as excluding every other reasonable hypothesis.* Unless upon our review of the evidence, and the reasonable inferences fairly to be deduced therefrom, it appears that there is no reasonable basis therein for such a conclusion, we should not overturn the verdict.

*Id.* (footnote omitted) (emphasis added). Thus, the Utah Supreme Court has ruled that despite the existence of theoretically "reasonable" hypotheses, it is within the province of the jury to judge the credibility

in writing every issue or claim raised.") (footnote omitted); *State v. Carter,* 776 P.2d 886, 888–89 (Utah 1989) (same).

3.  Defendant also appeals the district court's denial of his motions to quash the bindover order, to dismiss the case, and to arrest judgment. The challenges to the denials of the motions to dismiss and to arrest judgment are rendered moot by our disposition of defendant's claim that the evidence was insufficient to support the jury verdict. Defendant's objection to the trial court's refusal to quash the bindover is also moot in light of defendant's subsequent conviction. *State v. Quas,* 837 P.2d 565, 566–67 (Utah App.), *cert. denied,* 853 P.2d 897 (Utah 1992); *see also State v. Humphrey,* 823 P.2d 464, 467 n. 6 (Utah 1991).

of the testimony, assign weight to the evidence, and reject these alternate hypotheses. As the *Tanner* court observed, " '[t]he rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a *reasonable* one consistent with the circumstances and facts proved.' " *Tanner*, 675 P.2d at 550–51 (quoting *Huerta v. State*, 635 S.W.2d 847, 851 (Tex.Ct.App.1982) (citation omitted)); *see also State v. John*, 586 P.2d 410, 412 (Utah 1978) ("The proper application of that rule [that in order to warrant a conviction the evidence must exclude every reasonable hypothesis other than the defendant's guilt] requires that it be based upon what the jury regards as substantial and credible evidence.... In so doing, they may consider all of the facts affirmatively shown, as well as any unexplained areas, and draw whatever inferences may fairly and reasonably be drawn therefrom in the light of their own experience and judgment.").

Subsequent case law demonstrates continued reliance upon the *Huerta* standard for reviewing the sufficiency of circumstantial evidence to sustain a conviction. In *State v. Worthen*, 765 P.2d 839 (Utah 1988), the court held that although "[t]he evidence is circumstantial as to when the fatal blow was struck and *as to who struck it*," it was within the province of the jury to sift through conflicting evidence and find that "defendant was the only person with the child at the time the fatal blow was inflicted." *Id.* at 851 (emphasis added). Therefore, although it was reasonable to hypothesize that the mother, and not defendant, was the perpetrator, the *Worthen* court evidently ruled that the "hypothesis intended [that defendant was the perpetrator] is a reasonable one consistent with the circumstances and facts proved." *Tanner*, 675 P.2d at 551.

We note some contradiction in *Tanner* between the *Huerta* standard that circumstantial evidence need not exclude all other hypotheses and the theory that the jury cannot convict as a matter of law if reasonable alternative hypotheses exist regarding the identity of the perpetrator. However, in light of the Utah Supreme Court's adherence to the

*Huerta* standard in subsequent case law, we will apply that same standard in our analysis of the case at bar.

■ Defendant correctly notes that there was evidence that Christy experienced a blackout on the morning in question and that she was capable of violence during a blackout. However, "[w]e have previously stated ... '[t]he mere existence of conflicting evidence ... does not warrant reversal.' " *State v. James*, 819 P.2d 781, 784 (Utah 1991) (quoting *State v. Warden*, 813 P.2d 1146, 1150 (Utah 1991)); *see also Worthen*, 765 P.2d at 851 (noting that "evidence is circumstantial as to when the fatal blow was struck and as to who struck it," but affirming conviction on grounds that it was within the province of the jury to weigh conflicting evidence); *State v. Watts*, 675 P.2d 566, 568 (Utah 1983). Instead, we must simply " 'insur[e] that there is sufficient competent evidence as to each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime.' " *James*, 819 P.2d at 784 (citation omitted). The existence of one or more alternate reasonable hypotheses does not necessarily prevent the jury from concluding that defendant is guilty beyond a reasonable doubt.

■ The first element of depraved indifference murder requires that defendant engage in conduct creating a grave risk of death to another that resulted in the death of that individual. Given the unusual nature of Faith's injury, it was reasonable for the jury to reject the hypothesis that Christy inflicted the deadly injury and infer instead that defendant's habit of tightly squeezing Faith into the fetal position for long periods of time cut off her circulation, resulting in swelling of the brain and, ultimately, death. Alternatively, defendant's admission that he had struck Faith on the head several times could lead to legitimate inferences that he struck her on the head on the morning in question, resulting in death. Moreover, the record indicates that there was evidence defendant was the primary caregiver for Faith when she was ill, as she was on the morning in question. There was evidence Faith had Su-

# 696

dafed in her system, which Christy denied giving her (suggesting defendant administered some care to Faith on that morning). In addition, the large amount of Sudafed in Faith's system should have made her irritable and awake when Christy held her at 5:00 a.m. There was further evidence that Faith's prior injuries, including two broken arms, scalp trauma, and an injured ankle; occurred during the time defendant lived with Christy.[4] Thus, there was sufficient evidence from which a jury could reasonably conclude that defendant, not Christy, was the individual who inflicted Faith's fatal injuries.

The second element of depraved indifference murder requires defendant's knowledge that his conduct, or the circumstances surrounding his conduct, created a grave risk of death to another. The testimony at trial was that defendant was a trained medic with combat training and emergency medical experience. Moreover, defendant expressly stated at trial that he understood that depriving an individual of oxygen will threaten his or her life. That testimony, combined with Harding's testimony that she repeatedly warned defendant he was cutting off Faith's circulation when he forced her into the fetal position, supports the jury's conclusion that defendant knew his conduct created a grave risk of death to another. In addition, defendant testified that he knew a severe blow to the skull could lead to death, and that this was particularly true in the case of an infant. Therefore, under either scenario, whether Faith's death was a result of the back injury or the blow to her head, the knowledge requirement for depraved indifference would be satisfied.

Finally, defendant argues the evidence was insufficient to establish the third element of depraved indifference murder—that he acted under circumstances evidencing depraved indifference to human life—a qualitative judgment to be made by the jury in determining the extent of defendant's conduct. Depraved indifference requires "a knowing doing of an uncalled-for act in callous disregard of its likely harmful effect on a victim, which is so heinous as to be equivalent to a 'specific intent' to kill." *Bolsinger*, 699 P.2d at 1220 (citation omitted). It is "characterized by unmitigated wickedness, extreme inhumanity or acts exhibiting a high degree of wantonness." *Id.* (citation omitted). In view of Faith's size, the severity of the blow leading to Faith's skull fracture (described as the equivalent of a fall from a second story window onto concrete), and the torture of a compression injury that slowly broke Faith's back, the evidence supports a finding of "depraved indifference."

Based upon the foregoing, we conclude that the evidence was sufficient to establish all three elements of depraved indifference murder.

## 2. *Evidence of Christy's Prior Violent Acts*

At trial, defendant attempted to introduce testimonial and other evidence regarding prior violent acts committed by Christy while in a state of memory blackout. These acts occurred approximately four to five years before Faith's death and involved family members whom Christy either verbally threatened or threatened with weapons. In addition, on one occasion, Christy allegedly poked a wooden spoon into her brother's eye, and then "came to" with no recollection of the assault.

The trial court ultimately permitted Christy to testify concerning the similarity of her feelings upon awakening on August 5th with those occurring after earlier blackout episodes, but excluded the remainder of her testimony concerning specific violent acts as well as all other evidence of these occurrences as irrelevant and "more prejudicial than probative." Specifically, the trial court ruled, "It's too remote in time, and I do believe that it is factually dissimilar to this particular case. There's no evidence in this case that there's a knife used or a weapon

---

4. In *State v. Worthen*, 765 P.2d 839 (Utah 1988), the Utah Supreme Court noted that the fact " 'that there was no abuse prior to the time that [defendant] moved into the home, and that after [defendant] moved into the home there was sub- stantial abuse' " was "some evidence" that defendant may have been the perpetrator, although, viewed in isolation, it was not "strong" evidence. *Id.* at 846 & n. 3 (citation omitted).

used to administer any harm to this particular child."

■ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R.Evid. 401. Our analysis regarding the relevancy of evidence " 'requires a balancing of factors, and we will reverse a determination of relevancy only if the trial court abused its discretion.' " *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 454 (Utah App.1994), *cert. denied*, 899 P.2d 1231 (Utah 1995) (quoting *State v. Wetzel*, 868 P.2d 64, 67 (Utah 1993) (citation omitted)).

■ After review of the proffered testimony and the excluded evidence, we conclude the trial court did abuse its discretion in ruling that this evidence was irrelevant. Christy's prior violent acts when in a state of blackout were clearly relevant in light of her testimony that she believed she had experienced a blackout on the morning of August 5th. Moreover, the trial court's conclusion that this evidence was unduly prejudicial was also in error. *See First Nat'l Bank v. Osborne*, 503 P.2d 440, 441–42 (Utah 1972) (holding it was error for trial court to rule that evidence of other defendant's prior guilty pleas to similar crimes would "inflame the jury" since the evidence tended to establish that party's motive to commit the crime).

■ Notwithstanding our conclusion that the trial court abused its discretion in excluding evidence of specific acts of violence committed by Christy, we will only reverse if this error was harmful, " 'i.e., if absent the error there is a reasonable likelihood of an outcome more favorable to the defendant.' " *State v. White*, 880 P.2d 18, 21 (Utah App.1994) (quoting *State v. Dunn*, 850 P.2d 1201, 1221 (Utah 1993)); *accord State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992).

■ After thorough review of the record, we cannot conclude that absent the trial court's error, it is reasonably likely that the outcome of the trial would have been any different. While the specifics of Christy's prior violent acts were excluded, the jury nonetheless had extensive evidence before it of Christy's propensity for violence in a blackout condition. Christy herself testified that she could have done something to hurt Faith on the morning in question. Later, she testified twice that "it's possible" that she harmed Faith. Dr. Richard R. Wooten, a psychologist and designated examiner for the State of Utah, testified that Christy "has some propensity towards solving problems in more aggressive, hostile ways." Dr. Wooten agreed that "[w]hen crimes are committed by individuals who scored on the MMPI [Minnesota Multiphasic Personality Inventory] as did Christy, they tend to be vicious and assaultive and often appear as senseless, poorly planned and poorly executed." Finally, Dr. Wooten testified that he believed there was a "strong likelihood" Christy would be violent during a blackout, and that Christy was capable of inflicting the particular injuries suffered by Faith. Another expert, Dr. Robert J. Howell, a clinical and forensic psychologist, testified that Christy "very much was capable of violence" toward Faith during the summer months of 1992. In addition, he also mentioned that it was his understanding that Christy had at one time mistreated Faith physically during a blackout state.

Adding to the two experts' testimonies regarding Christy's propensity for violence while in a blackout, and her own testimony to that effect, was testimony from Maggie Carron, Kenny L. Revoir, and Rachel Anderson. Carron, a neighbor, stated that she regularly "heard Chris shout obscenities at the baby, complaining about her taking Chris's food." She also said that she never heard defendant raise his voice to Faith, nor did she ever see any physical contact between the two. Revoir, a former boyfriend, testified that Christy once "tossed" Faith into a crib "from a distance." He also stated that he once observed Christy shaking Faith. Anderson, an acquaintance of Christy's, said that on one occasion when Faith was crying, Christy got "frustrated" with Faith and started shaking her. She described that shake as "enough to rattle her brain." After shaking Faith, Christy then "tossed" Faith onto a couch

from a distance of approximately two feet. When Faith continued to cry, Christy "just picked [her] up and kind of smacked the baby [twice], told her to be quiet." On another occasion, Anderson saw Christy "shake" and "squeeze" Faith to get her to stop crying. When Faith arched her back and "had a fit," Christy "kind of like strangled her."[5]

Finally, in addition to all of the testimony concerning Christy's actual violent acts toward Faith, and concerning her propensity for violence while in a blackout, the jury also heard references to the excluded acts of violence committed by Christy while in blackout states four or five years earlier. When Christy was called to the stand a second time, she read aloud portions of letters she had written to defendant from her jail cell. Christy stated that she had no recollection of writing these letters; they were apparently written in a state of memory blackout. All references to Christy's prior violent acts were supposed to have been redacted from the letters. However, counsel inadvertently failed to redact one part of a letter written by "Angel," one of Christy's other "personalities." The letter read, in relevant part:

> She [Christy] has a thought process. This is once [sic] her dead daughter, her lost son, her threatening her brother with butcher knives, letters to her mother saying how she was going to kill her. . . .

The judge immediately held a brief conference off the record after Christy finished reading, but the jury was never instructed to disregard this portion of the letter.

Thus, review of the record indicates that the jury had ample evidence of Christy's actual violent acts and potential for violence. Also, despite the trial court's ruling, the jury did hear evidence of most of the excluded specific acts of violence committed by Christy. Therefore, we conclude the trial court's error in excluding the evidence was harmless.

### 3. Child Abuse Syndrome Evidence

■ Defendant argues that the trial court "should have excluded any and all evidence of child abuse syndrome in the absence of competent evidence linking the abuse to this defendant." He also contends that the evidence was inadmissible under Utah Rules of Evidence 401 and 403 because it was irrelevant and more prejudicial than probative, and that the evidence constituted inadmissible "character" evidence under Rule 404. Because the underlying facts are not in dispute, we review this challenge under a "correction of error" standard. *See State v. Morgan,* 865 P.2d 1377, 1380 (Utah App.1993).

■ Under the circumstances of this case, child abuse syndrome evidence was admissible, even though "evidence regarding the child's physical condition does not directly indicate the culpability of any particular defendant." *State v. Tanner,* 675 P.2d 539, 543 (Utah 1983), *superseded on other grounds, State v. Walker,* 743 P.2d 191, 193 (Utah 1987); *accord State v. James,* 819 P.2d 781, 792 (Utah 1991); *State v. Worthen,* 765 P.2d 839, 846 (Utah 1988). It therefore does not suggest the character of any particular defendant, nor unfair prejudice. Instead, "the pattern of abuse is relevant to show that *someone* injured the child intentionally, rather than accidentally." *Tanner,* 675 P.2d at 543; *accord State v. Allen,* 839 P.2d 291, 297 (Utah 1992); *James,* 819 P.2d at 792. Evidence of child abuse syndrome was relevant to establish that Faith was not injured accidentally. Although the evidence of abuse was not linked to defendant, the jury could draw reasonable inferences therefrom, *see Tanner,* 675 P.2d at 542–43 n. 2, and its probative value, under the facts of this case, was not substantially outweighed by the danger of unfair prejudice. We therefore affirm the trial court's decision to admit this evidence.[6]

---

**5.** It is not clear from the transcripts exactly how this occurred. Anderson stated that Christy did not have her hands around Faith's neck. The "choking" appears to have resulted in some manner from the way Christy was holding Faith.

**6.** Defendant has never argued that the child abuse syndrome evidence introduced to establish that Faith did not die by accident was *irrelevant* because he did not dispute at trial that Faith was murdered. *See State v. Teuscher,* 883 P.2d 922, 926 (Utah App.1994) (defendant's claim that accidental death was not an issue at trial and

### 4. *Suppression Challenges*

Defendant challenges the admission into evidence of a video tape made of his home, the audio portion of that tape, the incriminating statement made by defendant to police, and the audio tape of that statement.[7]

#### a. Admission of the Video Portion of the Video Tape and Incriminating Statements

▮▮▮ The video portion of the video tape and the incriminating statements were the subject of a pre-trial motion to suppress. The motion was denied, it was not renewed at trial, and defendant has not properly appealed this ruling. Moreover, defendant has failed to include a transcript of the May 10, 1992 evidentiary hearing. We assume the regularity of the proceedings below when appellant fails to provide an adequate record on appeal. *Jolivet v. Cook*, 784 P.2d 1148, 1150 (Utah 1989), *cert. denied*, 493 U.S. 1033, 110 S.Ct. 751, 107 L.Ed.2d 767 (1990). In addition, defendant has entirely failed to meet his burden of marshalling the evidence. *See State v. Teuscher*, 883 P.2d 922, 930 (Utah App.1994) (ruling that because "[d]efendant has failed to properly marshal the evidence in favor of the trial court's findings ... [w]e therefore accept the findings as entered"). Instead, defendant has merely realleged his version of the facts. This is not sufficient to challenge the trial court's findings or conclusions. *See State v. Tucker*, 657 P.2d 755, 756–57 (Utah 1982). Thus, we uphold the trial court's ruling denying defendant's motion to suppress this evidence.

#### b. Rule 403 Considerations with Respect to the Video Tape

▮▮▮ Defendant claims that the video tape of his messy home had no evidentiary purpose and was merely introduced to prejudice the jury against him. The State argues the tape is relevant, probative evidence of "the location of the crime, ... the crime scene while it was still essentially undisturbed, and ... the emotional state of the defendant within hours of the offense."

Rule 403 states in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." Utah R.Evid. 403. The trial court has "considerable freedom in applying [Rule 403] to the facts, freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse." *State v. Pena*, 869 P.2d 932, 937–38 (Utah 1994); *accord State v. White*, 880 P.2d 18, 21 (Utah App.1994). We will not overturn the trial court's decision regarding admissibility of evidence unless it was an abuse of discretion. *White*, 880 P.2d at 20 (citations omitted). That is, if the ruling is "beyond the limits of reasonability." *State v. Menzies*, 889 P.2d 393, 404 (Utah 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995). Moreover, even if the court erred in admitting the challenged evidence, "we will only reverse if the error was harmful, 'i.e., if absent the error there is a reasonable likelihood of an outcome more favorable to the defendant.'" *White*, 880 P.2d at 21 (quoting *State v. Dunn*, 850 P.2d 1201, 1221 (Utah 1993)).

At least one court in another jurisdiction has ruled that video tapes depicting slovenly living conditions are irrelevant where "nothing there revealed had anything to do with the charges." *State v. Britain*, 156 Ariz. 384, 752 P.2d 37, 38 (Ct.App.1988). This is because "[a]ll that was implied was that ... the shoddy nature of defendant's home made it more likely that defendant was guilty. That is simply not a permissible basis on which to infer guilt." *Id.*

---

therefore evidence of prior acts of child abuse were erroneously admitted was rejected because "the manner in which defendant presented her defense placed ... [the issue] in question"). Moreover, "[i]n pleading not guilty, defendant put every element of the charge against [him or] her in issue," including absence of mistake or accident. *Id.* at 927.

**7.** Defendant also argues that the trial court erred by failing to suppress the crib sheet found in Faith's crib. However, the crib sheet was not offered into evidence at trial, nor did the State present any evidence stemming from the seizure of the sheet. Therefore, we do not address this argument.

We agree that under the circumstances of this case the video tape provided irrelevant evidence. A video tape of the "undisturbed" location of the crime was unnecessary and the video tape did not provide any other evidence regarding the crime charged. In addition, the tape would have some potential for prejudice. However, we cannot conclude that absent admission of the tape, it is reasonably likely the outcome would have been more favorable to defendant. The case turned upon other evidence, in particular the evidence concerning the way defendant constricted Faith's back for long periods of time, and defendant's admission that he struck Faith on the head several times. Therefore, while the trial court abused its discretion in admitting the video tape, this error was harmless.

### c.   Audio Portion of the Video Tape

Defendant also objects to the playing of the video tape at trial with the audio portion audible to the jury. He contends that the narrative by the officer was hearsay and that neither he nor Christy received "adequate warnings as to their right to remain silent nor that the tape could be used against them in court." The latter claim is waived because defendant did not make this objection at trial. *State v. Jennings*, 875 P.2d 566, 570 (Utah App.1994). As for the claim that the narrative of the officer was hearsay, the trial court ruled it was an exception to the hearsay rule under Utah Rule of Evidence 803. Rule 803 permits the admission of statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Utah R. Evid. 803(1). Because the officer's narrative was made while perceiving defendant's home, the narrative was admissible hearsay.

### 5.   *"Depraved Indifference" Jury Instruction*

Defendant argues that the instruction given to the jury defining "depraved indifference" was "grossly inadequate and failed the necessary requirements as stated by the Utah Supreme Court." At

trial, the State submitted a set of proposed jury instructions containing one definition of "depraved indifference." Defendant objected to the instruction, and the State withdrew it. The State's second set of instructions included a different definition of "depraved indifference." Defendant's response to this instruction was that it was "a correct statement of the law," although defendant's requested instruction "more accurately and adequately defines the term 'depraved indifference.'" The court gave the State's second instruction to the jury.

Defendant's challenge to the instruction comes too late. Rule 19(c) of the Utah Rules of Criminal Procedure states that,

> [n]o party may assign as error any portion of the charge or omission therefrom unless he [or she] objects thereto before the jury is instructed, stating distinctly the matter to which he objects and the ground of his objection. Notwithstanding a party's failure to object, error may be assigned to instructions to avoid a manifest injustice.

*Id.; see also State v. Perdue*, 813 P.2d 1201, 1203 (Utah App.1991). Because defendant failed to object to the instruction at trial, we can reach the issue only to avoid manifest injustice. However, the manifest injustice exception has no application in cases in which the defendant invited the very error complained of on appeal. *State v. Medina*, 738 P.2d 1021, 1023 (Utah 1987) (court refused to consider manifest injustice exception where defense counsel stated she had no objection to the instruction); *Perdue*, 813 P.2d at 1206. Here, defendant's counsel agreed that the instruction was a correct statement of the law and did not specifically object to the instruction, but merely offered an alternative. Accordingly, defendant's challenge to the depraved indifference instruction must be dismissed.

### 6.   *Unconstitutionality of Section 76–5–203 (Murder Statute)*

Defendant contends that Utah Code Ann. § 76–5–203(1)(c) (1995) is "duplicitous [sic] and void for vagueness" in violation of the United States and Utah Constitutions. However, defendant did not challenge the constitutionality of the statute at trial, nor

has he argued plain error or exceptional circumstances on appeal.[8] As a result, we need not reach this claim. *State v. Stevenson*, 884 P.2d 1287, 1292 n. 8 (Utah App.1994) ("[D]efendant has not argued on appeal that plain error or exceptional circumstances exist regarding these issues thus precluding our consideration.") (citation omitted); *State v. Sepulveda*, 842 P.2d 913, 918 (Utah App. 1992).

### 7. *Court Error in Discussing Possible Punishment with Jury*

The trial court told the jury at the commencement of trial:

> Now, as I read to you the—I believe the first jury instruction, which outlined the charge here, murder, a first-degree felony, *it's also my duty to advise you of the maximum penalties in this case.* First-degree felony, murder or otherwise, is punishable by incarceration in the Utah State Prison for a period of five years to life together with the possibility of the imposition of a $10,000 fine and/or both.

■■■■ Defendant correctly notes that, ordinarily, punishment is not the province of the jury. *State v. Cude*, 784 P.2d 1197, 1202–03 (Utah 1989); *State v. Shickles*, 760 P.2d 291, 296 (Utah 1988). However, an inadvertent mention of punishment to the jury is an error that may be cured by the trial court, as defendant also acknowledges. *See United States v. Calandrella*, 605 F.2d 236, 255 (6th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). In this case, immediately after the trial court made the comment about penalties, the prosecutor requested a conference at the bench, and presumably alerted the trial court to its error. After this discussion, the trial court instructed the jury, "I need to further bring to your attention that ultimately, if there is a conviction in the case, it would be the province of the court to impose that penalty. You're not involved in the penalty phase whatsoever. You have nothing to do with that." In addi-

tion, jury instruction number nineteen reiterated that,

> [i]n arriving at a verdict in this case, you shall not discuss nor consider the subject of penalty or punishment, as that is a matter which lies with the court, and other court proceedings. The penalty and punishment for the crime charged must not in any way affect your decision as to the guilt or innocence of the defendant.

The trial court's two curative instructions were adequate to dispel prejudice, if any, and therefore the trial court's error did not affect the fairness of defendant's trial.

### 8. *Denial of Defendant's Motion for Bill of Particulars*

■■■■ Rule 4(e) of the Utah Rules of Criminal Procedure provides that a defendant may file a motion for a bill of particulars "[w]hen facts not set out in an information or indictment are required to inform a defendant of the nature and cause of the offense charged, so as to enable him [or her] to prepare ... a defense." Utah R.Crim.P. 4(e). Defendant filed timely motions for a bill of particulars and a "specification of the date place and time of the charged crime." *See State v. Wilcox*, 808 P.2d 1028, 1031–32 (Utah 1991). These motions were denied.

In reviewing a trial court's decision to deny a motion for a bill of particulars, "[w]e will not reverse ... unless the trial court has abused its discretion." *State v. Swapp*, 808 P.2d 115, 117 (Utah App.), *cert. denied*, 815 P.2d 241 (1991); *accord State v. Allen*, 839 P.2d 291, 298 (Utah 1992). In denying defendant's motions, the trial court ruled:

> [T]he defendant has adequately been informed of the time, place and date of the charged offense ... [and] has received adequate notice of the facts underlying the "depraved indifference" murder statute. In support of this finding the Court notes that the affidavit supporting the Information contains information pertaining to previous injuries suffered by the victim prior to the injury immediately causing death.

---

8. Defendant did not raise the issue of plain error or exceptional circumstances until the reply brief. "'[T]he rule is well settled that the court will not consider issues raised for the first time

in a reply brief.'" *State v. Phathammavong*, 860 P.2d 1001, 1004 (Utah App.1993) (quoting *White v. Kent Medical Ctr. Inc.*, 61 Wash.App. 163, 810 P.2d 4, 8 (1991)); Utah R.App.P. 24(c).

The affidavit identifies the defendant as one of the victims's two caretakers. Additionally, the affidavit recounts some of the medical examiner's autopsy report detailing the cause of death as resulting from a blow to the head and back received shortly before death.

We agree with the trial court that the affidavit and information provided sufficient information to enable the defendant to prepare his defense. In addition to setting forth the details cited by the trial court, the affidavit also described the events of the morning on which Faith was taken to the hospital and included defendant's admission that he had struck Faith more than once. Finally, the affidavit was consistent with the evidence presented at trial and defendant makes no showing that further detail would have made any difference in the conduct of the trial, let alone the outcome. Therefore, defendant's allegation that the affidavit was "bare-bones" and failed to provide sufficient detail is untenable. The trial court did not abuse its discretion in denying defendant's motions.

### 9. *Prosecutorial Misconduct in Closing Argument*

■■■■ In closing argument, the prosecutor summed up the evidence concerning Faith's back injury and noted that "the only way those ligaments could have been transected was for the baby to have literally been folded in half." The prosecutor concluded that the injury was so unusual, "[i]t's almost a signature injury." Defendant challenges this last comment as an overstatement of the evidence intended to "lead to [sic] jury improperly into false reasoning to relate the back injury to the Defendant's method of holding the child and then make the further logical leap to relate that to the cause of death of the infant."

We need not reach this argument for several reasons. First, defendant did not make a contemporaneous objection to the prosecutor's statement at trial. "Failure to object ... 'waives the claim unless the remarks reach the level of plain error.'" *State v. Taylor*, 884 P.2d 1293, 1298 (Utah App.1994) (quoting *State v. Palmer*, 860 P.2d 339, 342 (Utah App.), *cert. denied*, 868 P.2d 95 (Utah 1993)). Additionally, defendant has not alleged on appeal that the prosecutor's remarks reached the level of plain error. Thus, we need not consider this issue. *State v. Stevenson*, 884 P.2d 1287, 1292 n. 8 (Utah App.1994) ("[D]efendant has not argued on appeal that plain error or exceptional circumstances exist regarding these issues thus precluding our consideration.") (citation omitted). Next, defendant has not followed Rule of Appellate Procedure 24(a)(9) by failing to supply any authority or legal analysis supporting his conclusion that it was improper for the prosecutor to make this comment. *See D.D.Z. v. Molerway Freight Lines, Inc.*, 880 P.2d 1, 3 (Utah App.1994). Finally, even if we were to assume prosecutorial error, we would not conclude that in the absence of this error, " 'there would have been a more favorable result.' " *State v. Stevenson*, 884 P.2d 1287, 1290 (Utah App.1994), *cert. denied*, 892 P.2d 13 (Utah 1995) (quoting *State v. Cummins*, 839 P.2d 848, 852 (Utah App.1992), *cert. denied*, 853 P.2d 897 (Utah 1993)). For all of these reasons, we summarily dismiss defendant's argument.

### CONCLUSION

After careful review of each of defendant's arguments, we find inadequate grounds for reversal of the jury's verdict. While contradictory evidence existed regarding the identity of the individual who inflicted Faith's injuries, we find that there was sufficient competent evidence on each element of the crime charged to permit the jury to find, beyond a reasonable doubt, that defendant was guilty of depraved indifference murder. With respect to the other issues raised by defendant, we find them to have been waived, or where we have found error, we have determined it was harmless error. We therefore affirm.

BILLINGS and GREENWOOD, JJ., concur.